*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0017p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

MICHAEL GOODWIN,
  *Petitioner-Appellee/Cross-Appellant,*

  *v.*

DAVID JOHNSON, Warden,
  *Respondent-Appellant/Cross-Appellee.*

Nos. 06-3571/3572

_____

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-02963—John M. Manos, District Judge.

Argued: December 2, 2009

Decided and Filed: January 21, 2011

Before: MARTIN, GILMAN, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Sarah Lyn Leatherman, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Pamela Prude-Smithers, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellee. **ON BRIEF:** Matthew A. Kanai, Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Richard G. Lillie, LILLIE & HOLDERMAN, Cleveland, Ohio, Pamela Prude-Smithers, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge. Warden David Johnson appeals from the district court's order granting Michael Goodwin's petition for a writ of habeas corpus in part. The district court determined that Goodwin, convicted of murder and sentenced to death in the Cuyahoga County (Ohio) Circuit Court in December 1994, was denied his right

to effective assistance of counsel at sentencing. Goodwin applied for a certificate of appealability concerning the district court's denial of his other habeas claims. By order dated November 8, 2007, we granted Goodwin's application in part and denied it in part. We permitted Goodwin to appeal the district court's denial of his claims of: (1) ineffective assistance of counsel during the guilt phase of trial; (2) insufficient evidence of prior calculation and design; and (3) failure to instruct the jury on the lesser included offense of involuntary manslaughter. On due consideration of the parties' briefs and oral arguments, as well as the record below and the district court's decision, we overrule the Warden's appellate challenge and uphold the ruling that Goodwin did not receive effective assistance of counsel at sentencing. We also conclude that Goodwin's cross-appellate claims are without merit. For the reasons more fully set forth below, we therefore affirm the district court's decision in all respects.

## I. BACKGROUND

Goodwin was tried, convicted, and sentenced in December 1994 for his participation in the robbery of the Big Star Market in Cleveland, Ohio and the murder of Mustafa Sammour, a store clerk, just three months earlier. The Ohio Supreme Court summarized the facts of the case as follows:

> On September 13, 1994, appellant Michael Goodwin, James Padgett, and James Johnson robbed the Big Star Market at East 55th Street and Quimby Avenue in Cleveland. During the course of the robbery, Mustafa Sammour, a store clerk, was fatally shot.
>
> Between 8:55 and 9:10 a.m. on the morning of the robbery, a milk truck driver, Lawrence Austin, saw two men exit the market and run down the street. Subsequently, Austin saw Goodwin, wearing a shirt with the number " 7" on it, also exit the market. Austin observed that Goodwin dropped some money on the ground while trying to put the money in his pocket. Austin retrieved the dropped money and took it inside the market, giving it to one of the clerks. Once inside the market, Austin saw one clerk, Mustafa, lying on the floor. Almohannad Sammour, another clerk, stated to Austin, "[T]hey shot my cousin." Two bystanders also witnessed the three men running down the street from the market. Marilyn Rox, who knew Goodwin, identified him as one of the men running.

Later the same morning, Goodwin called Tyrone Griffin and asked him to dispose of a bag. Griffin retrieved a bag from Goodwin containing trousers and a shirt with the number "7"on it. Padgett testified that Goodwin's clothes were stained with blood. Griffin destroyed the clothing.

At the crime scene, the police found Mustafa's body behind a counter. Blood was splattered about the area near his body. On the counter, the police found twelve one-dollar bills. Detectives also discovered a copper-jacketed bullet in the refrigeration area of the store, near Mustafa's body. A forensics expert later concluded that the bullet had been fired from either a .357 Magnum or .38 caliber revolver. Near the floor by the safe, detectives found a bullet hole and fragments of a second bullet. About two weeks prior to the robbery, Jermaine Brown, a friend of the appellant, had sold the appellant a .357 Magnum revolver.

Dr. Martha Steinberg, a forensic pathologist, found that Mustafa Sammour died as a result of a gunshot wound to the left forehead. The wound was described as a "through and through" gunshot wound, causing such extensive injury to Mustafa's brain and skull that, in the words of Steinberg, "death was virtually immediate." Steinberg further stated that the impact of this type of wound would be so forceful that the shooter could possibly have had blood and remains of the victim's brain splattered onto him.

On September 14, the police arrested Goodwin. After advising him of his rights, he told police that he alone robbed the market and that Johnson and Padgett were customers. He stated that he pointed his gun at the "Arab clerk" and ordered him to take him, Goodwin, to the safe. Goodwin further stated that after Mustafa said something, "the gun just went off." Upon further questioning, Goodwin stated that he confronted the other clerk, Almohannad. Almohannad took him to the safe, where, according to Goodwin, the gun "just went off" again. Before he left the store, Goodwin took money from the safe and the cash register.

Two days later police again interviewed Goodwin. He changed his previous statement by naming Johnson and Padgett as accomplices. He claimed that Padgett was armed with the .357 Magnum revolver, that he had a .45 automatic handgun, and that Johnson was unarmed. Goodwin claimed that Padgett had shot the clerk. While in jail, however, Goodwin confided to Antoine Robinson, another inmate at the jail, that he had shot Mustafa. He also told Johnson that he would blame the killing on Padgett, as Padgett was the only one among the three robbers who did not have children.

Goodwin was charged with aggravated murder in violation of R.C. 2903.01(A), with felony murder and firearm specifications; aggravated

murder in violation of R.C. 2903.01(B), with felony murder and firearm specifications; aggravated robbery in violation of R.C. 2911.01(A)(1); and with having a weapon while under disability in violation of R.C. 2923.13. Padgett and Johnson were both offered plea agreements in exchange for their testimony against Goodwin.

At trial, the following testimony was adduced. Derrick Flonnory, a friend of the appellant, testified that the appellant stopped at his house around 8:15 or 8:30 on the morning of the robbery. Goodwin wanted Flonnory to help him rob the market, but Flonnory declined. Padgett and Johnson testified that Goodwin suggested to them that they rob the market. Both Padgett and Johnson testified that Goodwin was carrying the .357 Magnum revolver prior to entering the store. When the three men arrived at the market, Goodwin went inside first. All three men wore hats pulled down over the faces.

After entering the market, Padgett and Johnson confronted Almohannad. Goodwin confronted Mustafa. Mustafa had his hands up. There was no testimony that he resisted in any way. While Mustafa stood with his arms raised above his head, Goodwin shot Mustafa in the head. After Goodwin shot Mustafa, he pointed the gun at Almohannad's head and ordered him to take Goodwin to the safe. Almohannad offered no resistance and pleaded with Goodwin not to shoot him. Almohannad then opened the safe and gave Goodwin the money. While Almohannad was giving Goodwin the money, Goodwin fired a shot into the floor, retrieved money from the cash register, and then exited the market with Johnson and Padgett.

Testimony by Almohannad, Mustafa's cousin, generally corroborated that of Johnson and Padgett. When the three men came into the store, Almohannad recognized Johnson and Goodwin as regular customers. Subsequently, Padgett grabbed Almohannad from behind. Almohannad stated that both Johnson and Goodwin were armed. However, Almohannad did not see who fired the shot that killed Mustafa.

Following the robbery, the three men went back to Goodwin's house, where Goodwin divided the money. Goodwin gave the men approximately one hundred thirty dollars each, and kept the rest for himself. In his statement to the police, Goodwin admitted stealing approximately five hundred dollars.

During cross-examination, Padgett and Johnson admitted that their testimony conflicted with their original sworn statements to authorities. For example, Johnson first told police that he had no gun, but, at trial, he testified that he was armed with a .45 caliber pistol. Also both Padgett and Johnson told police that they had never received any money from the robbery, when in fact Goodwin had split the proceeds with them.

The defense presented no evidence.  Rather, the defense argued that a reasonable doubt existed as to whether Goodwin shot Mustafa.

The jury convicted Goodwin, as charged, of aggravated murder with prior calculation and design, aggravated felony-murder, aggravated robbery, and possession of a firearm while under a disability.  Both murder counts contained a death penalty specification.

The defense presented no evidence at the penalty hearing.  The jury recommended the death penalty.  Prior to the trial court's passing sentence, Rosetta Goodwin, Goodwin's aunt, stated that Goodwin did not deserve the death penalty because he was born drug dependent and because his mother abandoned him when he was nine.  Goodwin apologized to the victim's family.  He stated that he did not intend to kill Mustafa, claiming that he hit Mustafa with the gun, and the gun went off.  Goodwin also admitted to the trial judge that he took Mustafa's life, saying, "I did take the man's life, but I confess up to my crimes."

The trial judge sentenced Goodwin to death on the counts of aggravated murder.  Goodwin received additional sentences of ten to twenty-five years on the count of aggravated robbery, and one and one-half years on the weapon disability count, with an additional three years imposed pursuant to a firearm specification.

*State v. Goodwin*, 703 N.E.2d 1251, 1254-56 (Ohio 1999).

After his trial and conviction, Goodwin appealed, represented by different counsel.  On appeal, he asserted claims for ineffective assistance of trial counsel, prosecutorial misconduct, improper jury selection, insufficiency of the evidence, and improper jury instructions.  The Ohio Court of Appeals affirmed his convictions and sentences in April 1997.  *State v. Goodwin*, No. 68531, 1997 WL 186770 (Ohio App. 8 Dist.).  The Ohio Supreme Court affirmed Goodwin's convictions and sentences in January 1999 and denied reconsideration.

Goodwin had filed a petition for post-conviction relief in the trial court in September 1996, while his direct appeal was pending.  He again raised the issue of ineffective assistance of counsel.  The trial court denied the petition without an evidentiary hearing.  The Ohio Court of Appeals affirmed that decision in May 1999.  *State v. Goodwin*, No. 72043, 1999 WL 342305 (Ohio App. 8 Dist.).  The Ohio Supreme Court denied further review.

Goodwin filed his habeas petition in federal court in June 2000, raising twelve claims. The district court held an evidentiary hearing on Goodwin's claim of ineffective assistance of counsel at sentencing. By order dated March 22, 2006, the district court granted habeas relief on that claim and denied the remaining claims. *Goodwin v. Johnson*, No. 1:99-cv-2963, 2006 WL 753111 (N.D. Ohio). The Warden appeals the grant of habeas relief as of right. Goodwin has cross-appealed, challenging the denial of his other claims. We granted Goodwin's application for a certificate of appealability with respect to three of those claims.

## II.  ANALYSIS

### A.  AEDPA Standard of Review

We review the district court's legal conclusions and rulings on mixed questions of law and fact de novo, and we review its factual findings for clear error. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004); *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the federal courts may not grant habeas relief on any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that:  (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decided the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal court may grant the writ only if the state court identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the petitioner's case. *Id.* Yet, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather,

to warrant habeas relief, the application must be found to be "objectively unreasonable." *Id.* at 409. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

In analyzing whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may look only to the holdings of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412. However, the court may look to lower courts of appeals' decisions to the extent they illuminate the analysis of Supreme Court holdings in determining whether a legal principle had been clearly established by the Supreme Court. *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010). Finally, where factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct. *See* 28 U.S.C. § 2254(e)(1); *Landrum*, 625 F.3d at 914.

In conducting our review, we first address Goodwin's cross-appeal, which challenges the district court's denial of habeas relief on three of his claims.

### B.  Ineffective Assistance in Guilt Phase

First, Goodwin contends his lead trial counsel, Thomas Shaughnessy, did not afford him effective assistance of counsel because he conceded Goodwin's guilt on all charges during his opening statement and closing argument.[1]  To prevail on an ineffective-assistance-of-counsel claim, Goodwin must satisfy both prongs of the *Strickland* test:  inadequate performance by defense counsel and prejudice resulting from that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish deficient performance, Goodwin must show that "counsel's performance fell below an objective standard of reasonableness." *Id.* at 688.  Scrutiny of counsel's

---

[1]Goodwin's trial counsel team consisted Thomas Shaughnessy and Patrick D'Angelo. Shaughnessy died in 1997.

performance is highly deferential, however; every effort must be made to eliminate the distorting effects of hindsight.  *Id.* at 689.  Goodwin is thus required to overcome the "strong presumption" that the challenged action might be considered sound trial strategy.  *Id.*  To establish prejudice, he must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."  *Id.*

Applying *Strickland*, the Ohio Supreme Court concluded that Goodwin's counsel's opening and closing statements were neither deficient nor prejudicial because "counsel's statements appear to have been made to concede Goodwin's participation in the robbery, and to preserve credibility of the only plausible defense theory, given the strong evidence against Goodwin—that despite Goodwin's participation in the robbery, he did not kill Mustafa." *Goodwin*, 703 N.E.2d at 1259.  Addressing prejudice, the Ohio Supreme Court found none, because the evidence against Goodwin was overwhelming:

> Goodwin told police he shot Mustafa.  The only gun observed at the crime scene that could have inflicted the fatal wound belonged to Goodwin, and testimony indicated that it was Goodwin who had the gun in his possession upon entering the market.  Additionally, Goodwin made sure his clothes were burned following the robbery.

*Id.*  The district court held the Ohio Supreme Court's application of *Strickland* was not unreasonable.

### 1. *Deficient Performance*

Our review of the record confirms that Shaughnessy intended to concede Goodwin's involvement in the robbery, but disputed that Goodwin shot the victim and deserved the death penalty.  In his opening statement, Shaughnessy began by noting that co-defendants Padgett and Johnson were originally charged with capital murder before reaching plea agreements.  He disputed the notion that they were motivated to tell the truth, and instead argued that their true motive was to avoid the electric chair.  He also told the jury that Padgett and Johnson could be paroled after serving only nine and one-

half years pursuant to the sentences recommended by the prosecutor. Shaughnessy said he was not claiming that Goodwin was a good kid, had an alibi, or was misunderstood. Instead, he told the jury:

> You shouldn't let him go, and as a matter of fact, when we get into it, and you've heard the evidence, I'm going to suggest to you right from the beginning that you should and you ought to, and as a matter of fact, let's go a little bit stronger than that, say that you must find him guilty.

Trial tr. p. 635, J.A. 1163. Shaughnessy continued by saying that all three men participated in deciding that a quick way to get money would be to rob the market. The trial, he said, was "about sending the right person to the electric chair if you think that ought to be the proper punishment." *Id.* at 637, J.A. 1165. Shaughnessy proposed that after the jury heard the evidence, they would not convict Goodwin as the killer.

In his closing argument, Shaughnessy said it did not make any difference who shot the victim under the jury instructions on aiding and abetting. He noted that all three men went into the store and were equally responsible. Shaughnessy also told the jury, "As to who pulled the trigger . . . you will consider that in the second trial." *Id.* at 1426, J.A. 1233. He reminded the jury of inconsistencies in the testimony; pointed out that the surviving clerk testified that Johnson appeared to be the ringleader; read portions of the clerk's testimony indicating that Goodwin was holding a gun to his head when the fatal shot was fired at Mustafa; and argued that Padgett was more likely the one who shot Mustafa. Shaughnessy then explained that, but for the law of aiding and abetting, he would have been vehemently arguing that, although Goodwin was a robber, he was not a killer, and he assured the jury they would have the opportunity to treat him as an aider and abettor in the punishment phase.

The charges against Goodwin place Shaughnessy's approach in perspective. Goodwin was charged in the indictment, along with co-defendants Johnson and Padgett, with two counts of aggravated murder under Ohio Rev. Code § 2903.01. The first count charged the defendants with aggravated murder for having purposely and with prior calculation and design caused the death of the victim, and included two death penalty specifications, felony murder and firearm. The felony murder specification, under Ohio

Rev. Code § 2929.04(A)(7), is based on the allegation that the murder was committed during the commission of an aggravated robbery and that each defendant was either the principal offender or acted with prior calculation and design. The second count, for aggravated murder, charged each defendant with having purposely caused the death of the victim while committing aggravated robbery. It contained the same specifications as the first count. Under Ohio law, an accomplice can be convicted of aggravated murder only if the evidence shows that the accomplice shared the criminal intent of the principal. *See State v. Herring*, 762 N.E.2d 940, 947 (Ohio 2002). A defendant who aids and abets the actual killer can be convicted of aggravated murder, but that finding does not require the jury to find the defendant was the principal offender for purposes of the death penalty specification. *State v. Taylor*, 612 N.E.2d 316, 325 (Ohio 1993).

We concur in the district court's determination that the Ohio Supreme Court did not apply *Strickland* unreasonably when it rejected Goodwin's claim. Shaughnessy's strategy to concede guilt to aggravated robbery but argue that Goodwin did not kill the victim was not deficient. *See Florida v. Nixon*, 543 U.S. 175, 189 (2004) (trial counsel's decision to concede guilt in the guilt phase of a capital trial held not necessarily deficient). Counsel's decision to concede guilt should be assessed under *Strickland* by considering the evidence of defendant's guilt and the chance to avoid execution. *Id.* at 191-92. The evidence of Goodwin's guilt as an aider and abettor to aggravated robbery was overwhelming, but the argument that Goodwin was not the trigger man bore some hope of avoiding a guilty verdict on the death specifications. *See Nixon*, 543 U.S. at 191-92 ("Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared."). Goodwin could not plausibly deny that he was part of the trio that robbed the store, in view of his statements to the police and the testimony of Johnson, Padgett, and the surviving clerk, all of whom placed him inside the store. Their testimony was not entirely consistent, however. Hence, it was reasonable for Shaughnessy to point out biases and inconsistencies in those witnesses' testimony and to argue that Goodwin did not shoot Mustafa and did not deserve the death penalty.

Padgett denied going to the market with the specific intent that any store worker be shot dead. Johnson testified about the plans to rob the store, but did not say they planned to kill the clerk. Accordingly, Shaughnessy's concession that Goodwin was involved in the aggravated robbery was not a concession that he was guilty of aggravated murder because none of the accomplices indicated that they intended to kill the victim. The Ohio Supreme Court's conclusion that Shaughnessy was trying to preserve the credibility of the only plausible defense theory by being candidly realistic with the jury was not unreasonable.

Shaughnessy did err in telling the jury that Goodwin was guilty of "all of the charges in the indictment" and that the question of who shot the victim would not be decided until the penalty phase. The charges in the indictment included the death penalty specification that Goodwin was the principal offender or acted with prior calculation and design, and the jury had to decide the death penalty specification in the guilt phase. However, this error was one of semantics, not strategy. In his opening statement, closing argument, and cross-examination of the state's witnesses, Shaughnessy consistently emphasized that although Goodwin was involved in the robbery of the store, there was reasonable doubt that he was the one who shot the clerk.

### 2. *Prejudice*

Even if Shaughnessy's errors were deemed to amount to deficient performance, it is clear that Goodwin did not suffer prejudice cognizable under *Strickland*. First, there was overwhelming evidence of Goodwin's guilt as the principal offender. As the state court found, Goodwin initially told the police that he shot the victim; the evidence established that Goodwin had a .357 revolver while in the store; the bullet that killed the victim matched Goodwin's firearm but not the .45 semi-automatic held by Johnson; and Goodwin's clothes were stained with blood. *Goodwin*, 703 N.E.2d at 1254-56. Although there is some evidence supporting the argument that Goodwin was not the actual killer, it is not substantial.

Further, it appears the trial court properly instructed the jury as to aggravated murder, the death penalty specification, and accomplice liability. The jury instructions cured any suggestion that Shaughnessy conceded Goodwin's guilt as the principal offender. The trial court instructed the jury that, in order to find Goodwin guilty of aggravated murder, the jury had to find that Goodwin had the specific intent to kill the victim. The court also instructed the jury that, in order to find that Goodwin was the principal offender under the death penalty specification, the jury had to find that Goodwin's conduct directly produced the death of the victim. Finally, the court told the jury that under accomplice liability, all persons who acted with a common purpose to commit a crime were responsible for all of the crimes committed. These are all proper instructions under Ohio law. With the aggravated murder and principal offender instructions in mind, the jury could not have interpreted the accomplice liability instructions to mean that Goodwin was guilty of aggravated murder as the principal offender without finding that he in fact shot the victim intending to kill him. Goodwin has not therefore shown that, but for Shaughnessy's errors, there is a reasonable probability the jury would not have found him guilty of the death penalty specification.

Goodwin also argues that Shaughnessy conceded that he acted with prior calculation and design, the other component of the death penalty specification under Ohio Rev. Code § 2929.04(A)(7). As discussed below, under Ohio law, "prior calculation and design" means that "the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the instrument with which to cause the death of another." *Zuern v. Tate*, 336 F.3d 478, 482 (6th Cir. 2003). The trial court defined prior calculation and design in the same terms. There was ample evidence that Goodwin, Padgett, and Johnson planned and prepared to rob the store at gunpoint, but no direct evidence that they intended to kill the clerk. Thus, when Shaughnessy acknowledged Goodwin's involvement in the decision to rob the store, he did not concede his involvement in a plan to kill the clerk. Moreover, in view of the correctness of the trial court's instructions and the abundant evidence that Goodwin was the principal offender, we are convinced that Goodwin was not prejudiced

by any impression that Shaughnessy unwittingly conceded that Goodwin acted with prior calculation and design. *See Poindexter v. Mitchell*, 454 F.3d 564, 581-82 (6th Cir. 2006) (counsel not ineffective for conceding that state had proved elements of murder where evidence of guilt was overwhelming).

### C. Insufficient Evidence of Prior Calculation and Design

Goodwin claims that the state failed to meet its burden of proving that he killed the victim with prior calculation and design, as required for a conviction under the first count of the indictment against him. On direct appeal, the Ohio Supreme Court found that the record evidence sufficiently supported the jury's verdict. The record was deemed to show that Goodwin: planned the robbery and recruited others to join him; armed himself with a .357 revolver; placed the weapon to the forehead of a cooperative and unresisting victim and pulled the trigger; and then, instead of fleeing after the killing, placed the gun to the head of the other clerk and continued robbing the store. The court concluded that Goodwin planned the robbery and used the murder to further his plan:

> It was an action that required thought on his part to place the gun at the victim's forehead, and he took additional time to decide to pull the trigger in order to carry out a calculated plan to obtain money from the store. This was not a spur-of-the-moment accidental shooting on the part of a robber. . . . It is readily apparent from these facts that sufficient time, reflection, and acts were involved to provide the necessary thought processes that the law requires for a finding of prior calculation and design.

*Goodwin*, 703 N.E.2d at 1263. The Ohio Supreme Court cited *State v. Jenks*, 574 N.E.2d 492, 503 (Ohio 1991), for its standard of review, which in turn relies on *Jackson v. Virginia*, 443 U.S. 307 (1979). The district court agreed that the evidence was sufficient to show prior calculation and design.

In assessing the sufficiency of the evidence, we must determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson*, 443 U.S. at 319; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). "The *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16). Under AEDPA, the task is to determine whether it was objectively unreasonable for the Ohio Supreme Court to conclude that a rational trier of fact, after viewing the evidence in the light most favorable to the state, could have found beyond a reasonable doubt that Goodwin committed the essential elements of aggravated murder under Ohio law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13; *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008).

Ohio courts have identified a number of factors relevant to determining whether a homicide was committed with prior calculation and design. These include:

> whether the accused knew the victim prior to the crime, as opposed to a random meeting, and if the victim was known to him whether the relationship and [sic] been strained; whether thought and preparation were given by the accused to the weapon he used to kill and/or the site on which the homicide was to be committed as compared to no such thought or preparation; and whether the act was drawn out over a period of time as against an almost instantaneous eruption of events.

*State v. Jenkins*, 355 N.E.2d 825, 828 (Ohio App. 8 Dist. 1976). Prior calculation and design requires evidence of more than a few moments of deliberation; it requires "a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 381 N.E.2d 190, 193 (Ohio 1978). Although "[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves," momentary deliberation is insufficient. *State v. D'Ambrosio*, 616 N.E.2d 909, 918 (Ohio 1993) (quoting the 1973 Legislative Service Commission Comment to Ohio Rev. Code § 2903.01). On the other hand, "[p]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 754 N.E.2d 1129, 1143 (Ohio 2001). The manner in which the victim is killed may allow the jury to reasonably find that the defendant committed the

crime with prior calculation and design. *See State v. Palmer*, 687 N.E.2d 685, 706 (Ohio 1997).

We have previously held the "prior calculation and design" requirement under Ohio law was satisfied where "the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the instrument with which to cause the death of another." *Zuern*, 336 F.3d at 482. "Prior calculation and design exists where the defendant plans to kill any member of a certain class of persons, even if he did not know in advance who the particular victim would be." *Id.*

The evidence clearly established that Goodwin planned and directed the robbery. *Goodwin*, 703 N.E.2d at 1254-55. A witness for the prosecution testified that Goodwin purchased a .357 revolver from him approximately two weeks before the robbery. Padgett and Johnson testified that Goodwin came up with the idea to rob the market and directed their actions. Goodwin told Johnson he needed money and knew where the money was kept in the market. Padgett said that he, Johnson and Goodwin went to Goodwin's home, where Goodwin retrieved the .357 revolver and Johnson retrieved a .45 semi-automatic. Goodwin's weapon was clearly loaded, as a firearms expert testified that the bullet that killed the victim could not have come from Johnson's weapon but could have come from Goodwin's. Goodwin entered the store first to see how many people were inside, came outside, and then all three went in. Goodwin told Padgett to distract the clerk by asking for cigars and Johnson was to act as a lookout. The surviving clerk testified that Goodwin told him, "You are being robbed," and that Goodwin told Padgett and Johnson to "get the safe, get the bag."

There is less evidence that Goodwin planned to murder the clerk. *See id.* at 1255. Both Padgett and Johnson testified that Goodwin grabbed the victim, put a gun to his head, demanded money, and shot him. The victim offered no resistance. The coroner testified that the victim died from a bullet fired into his head at close range. Goodwin grabbed the surviving clerk after shooting the victim and demanded to be taken to the office safe. Padgett testified that when he asked Goodwin why he shot the clerk,

Goodwin said the clerk reached for his mask and Goodwin thought the clerk saw his face. Padgett, Johnson, and the surviving clerk testified that Goodwin and the others were in the store for about five minutes.

We conclude that the Ohio Supreme Court did not apply *Jackson* unreasonably when it held that, taking the evidence in the light most favorable to the prosecution, a reasonable juror could have found that Goodwin killed the victim with prior calculation and design. There was evidence that Goodwin planned to rob the market where the victim worked, recruited accomplices, obtained a loaded handgun, and directed the robbery once it began. These circumstances show reasoning in advance, a mental plan, and consideration of the method, means and instrument needed to carry out that plan. *See Jenkins*, 355 N.E.2d at 828. Although Goodwin did not have a strained relationship with the victim, the clerk was within a class of persons Goodwin would have anticipated being present at the store and having access to the store's safe. *See Zuern*, 336 F.3d at 482.

The circumstances also support as reasonable the inference that Goodwin's decision to shoot the victim was not spur-of-the-moment or spontaneous. *See id.*; *Cotton*, 381 N.E.2d at 193; *Jenkins*; 355 N.E.2d at 828. The victim did not resist when Goodwin grabbed him, so a juror could reasonably conclude that Goodwin did not shoot him as the result of a struggle. Goodwin completed the robbery after shooting the victim, arguably supporting the inference that the shooting was not an unexpected turn of events and that Goodwin planned to shoot the victim to facilitate the robbery. Evidence that Goodwin placed the revolver to the victim's head before shooting him also supports a finding of prior calculation and design. *See State v. Monroe*, 827 N.E.2d 285, 296-97 (Ohio 2005); *State v. Campbell*, 738 N.E.2d 1178, 1193 (Ohio 2000); *Palmer*, 687 N.E.2d at 706.

We note that Goodwin was in the store for only five minutes. This is the weakest link in the state's case against Goodwin, since the amount of time elapsed seems closer to "an almost instantaneous eruption of events" than an act "drawn out over a period of time." *See Jenkins*, 355 N.E.2d at 828. However, under Ohio law, prior calculation and

design can be found even when the killer conceived and executed the plan to kill within a few minutes. *See Palmer*, 687 N.E.2d at 706; *State v. Taylor*, 676 N.E.2d 82, 89-91 (Ohio 1997). Moreover, Goodwin clearly planned to rob the store, knew that he would have to interact with the clerk to get the money out of the safe, put a loaded gun to the clerk's head, and pulled the trigger despite the clerk's compliance. We cannot conclude that the Ohio Supreme Court's denial of this claim was contrary to or an unreasonable application of clearly established federal law.

### D. Jury Instruction on Lesser Included Offense

Goodwin argues that he was deprived of his constitutional rights when the trial court failed to instruct the jury on the lesser included offense of involuntary manslaughter. He contends the evidence that he did not mean to shoot the victim would have permitted the jury to acquit him of aggravated murder but convict him of involuntary manslaughter. This challenge is addressed to his conviction for felony murder, Ohio Rev. Code § 2903.01(B).

Goodwin raised this claim on direct appeal, along with a claim that his trial counsel was ineffective for failing to request an instruction on involuntary manslaughter as a lesser included offense. The Ohio Supreme Court reviewed the underlying claim for plain error because Goodwin did not request an instruction on involuntary manslaughter as a lesser included offense in the trial court. *Goodwin*, 703 N.E.2d at 1265. Goodwin argued that because he did not mean to shoot the victim, because the gun "just went off," and because he drank gin the morning of the killing, the trial court should have given an instruction on involuntary manslaughter. The Ohio Supreme Court concluded the evidence established that Goodwin acted with prior calculation and design and that the killing was done with purpose:

> The evidence clearly establishes that Goodwin acted with prior calculation and design in killing Mustafa. Under any reasonable view, the killing was done with purpose. Goodwin fired a shot at point blank range into Mustafa's head. The testimony by the pathologist indicated that death was virtually immediate. The location of this wound would lead any reasonable trier of fact, who did not believe the gun discharged

accidentally, to conclude that Goodwin acted with purpose in causing the death of the victim. Additionally, Mustafa did not resist, cause panic, or cause confusion, nor was there any other cause of panic or confusion. Mustafa had his hands up. No reasonable juror who believed the state's version of the facts surrounding this shooting could have concluded that the killing was not done purposely and with prior calculation and design as that culpable mental state has been construed by this court.

*Goodwin*, 703 N.E.2d at 1265. Having found no plain error, the Ohio Supreme Court also found that Goodwin's trial counsel's failure to request an instruction on involuntary manslaughter was not ineffective assistance of counsel.

The district court acknowledged the state's assertion that Goodwin procedurally defaulted this claim, but also acknowledged that ineffective assistance of counsel can be "cause" to excuse the procedural default. The court thus addressed the merits of the claim and denied it. The court concluded that the trial court had not committed plain error by failing to give the manslaughter instruction because the record supported a finding that the shooting was intentional.

### 1. *Procedural Default*

Goodwin procedurally defaulted this claim because his attorney did not object to the jury instructions at trial or propose alternative instructions. Ohio's contemporaneous objection rule is a firmly established procedural rule that is an adequate and independent state ground to foreclose federal relief. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). The Ohio Supreme Court conducted only plain error review of Goodwin's jury instruction claim. *Goodwin*, 703 N.E.2d at 1265. "[P]lain error review by an appellate court constitutes enforcement of Ohio's contemporaneous objection rule." *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004). Accordingly, unless Goodwin can show cause for and prejudice from his default, he is not entitled to habeas review of this claim.

Ineffective assistance of counsel can constitute cause to excuse a procedural default. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). If Goodwin's trial counsel were ineffective for failing

to request an instruction on involuntary manslaughter as a lesser included offense, he could show cause to excuse his default of his substantive claim.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  Goodwin's ineffective-assistance-of-counsel claim regarding jury instructions can have merit only to the extent that the underlying claim has merit.  *See McFarland*, 356 F.3d at 699-700.  Accordingly, we review the merits to determine both whether Goodwin's default can be excused and whether the substantive claim entitles him to relief.

## 2. *Merits*

Where a lesser included offense exists under state law in a capital case, an instruction on the lesser included offense is required under the Eighth and Fourteenth Amendments only when the evidence would warrant a finding of guilt on the lesser included offense and an acquittal on the greater offense. *Beck v. Alabama*, 447 U.S. 625, 636 (1980); *see also Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) ("[A]*Beck* instruction is only required when 'there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense,' but not the greater." (quoting *Hopper v. Evans*, 456 U.S. 605, 610 (1982)).   "The goal of the *Beck* rule, in other words, is to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." *Schad v. Arizona*, 501 U.S. 624, 646-47 (1991).  The Ohio Supreme Court cited *State v. Thomas*, 533 N.E.2d 286, 289 (Ohio 1988), for the proposition that "[a]n instruction on a lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *Goodwin*, 703 N.E.2d at 1265.  This is substantially the same as the Supreme Court's language in *Beck* and *Hopper*.  Accordingly, the issue is whether the Ohio Supreme Court's application of *Beck* was objectively unreasonable.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 409; *Campbell*, 260 F.3d at 539-40.

*Beck* requires a comparison between the elements of the crime charged and the elements of the lesser-included offense.  Count 2 of the indictment charged Goodwin with purposely causing the death of the victim while committing aggravated robbery.

*See* Ohio Rev. Code § 2903.01(B).  At the time of Goodwin's trial, § 2903.01(B) stated in relevant part:   "No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape."   Under § 2903.01(D), "No person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another."   Ohio's statute on involuntary manslaughter provides:   "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit a felony."    Ohio Rev. Code § 2903.04(A).  Involuntary manslaughter is a lesser included offense of aggravated murder under§ 2903.01(A) and (B).  *Thomas*, 533 N.E.2d at 288-89.

The distinguishing factor between aggravated murder and involuntary manslaughter is the mental state involved.  *Id.* at 289.  These two mental states are mutually exclusive; in any given killing, the offender can be possessed of only one.  *Id.* The mental state required for aggravated murder is "purposely."  Ohio's criminal code provides that "[a] person acts purposely when it is his specific intention to cause a certain result.  Ohio Rev. Code § 2901.22(A); *see also Thomas*, 533 N.E.2d at 290. Accordingly, the question under *Beck* is whether the evidence would have permitted a reasonable jury to find that Goodwin caused the death of the victim as a proximate result of committing a felony but without specifically intending to cause the victim's death.

We conclude that the Ohio Supreme Court's application of *Beck* was not unreasonable.  After considering the paltry evidence held up as warranting a finding that the killing of Mustafa was not intentional, the Ohio Supreme Court held that "[u]nder any reasonable view, the killing was done with purpose." *Goodwin*, 703 N.E.2d at 1265. Hence, the court concluded that the involuntary manslaughter instruction was not warranted by the evidence presented, that the failure to give the instruction was not plain error, and that counsel's failure to request the instruction did not constitute ineffective assistance.

As detailed above, there was extensive evidence that Goodwin was involved in the events that led to the victim's death. *Goodwin*, 703 N.E.2d at 1254-56. Padgett, Johnson, and the surviving clerk all testified that Goodwin was one of the three who robbed the store, and Goodwin admitted his involvement to the police. Jermaine Brown testified that he sold a .357 revolver to Goodwin. Padgett testified that Goodwin retrieved a .357 revolver from his house. Johnson and Padgett testified that Goodwin placed the .357 revolver to the victim's head. A firearms expert testified that the bullet fragments recovered from the crime scene were consistent with a .357 revolver, but not the weapon carried by Johnson. The coroner stated that the bullet wound on the victim's forehead was a contact wound, and Goodwin's clothes were bloody. Although defense counsel argued that Padgett killed the clerk, there was almost no evidence from which a jury could have reasonably concluded that someone other than Goodwin held the .357 revolver that caused the victim's death.

There was conflicting evidence concerning whether Goodwin intended to fire the revolver, but not enough to justify an instruction on the lesser-included offense. On the one hand, Goodwin directs attention to remarks that indicate the shooting was unintentional. He did not testify at trial, but a statement he gave to the police was admitted. Goodwin told Detective Kovasic that he pulled out his gun and pointed it at the clerk and told him to take him to the safe, "and the next thing I knew, the gun just went off." When the detective asked Goodwin why he shot the clerk, Goodwin responded: "I don't know. I didn't mean to." Goodwin also said that he drank some gin the morning of the robbery and "felt it a little." In addition, Johnson testified that when he and Padgett confronted Goodwin after the robbery, Goodwin said he did not mean to shoot him.

On the other hand, this evidence of Goodwin's self-serving statements is at odds with the overwhelming weight of the evidence, which strongly suggests the shooting was intentional. The witnesses agreed that Goodwin held the weapon that was used to kill the victim. Padgett testified that when he asked Goodwin why he shot the clerk, Goodwin said that the clerk reached for his mask and Goodwin thought the clerk saw his

face.  Padgett and Johnson testified that the victim put his hands in the air and did not struggle or resist as Goodwin put the revolver to his head, and that Goodwin grabbed the surviving clerk after shooting the victim.  The surviving clerk heard the shot that killed the victim before Goodwin grabbed him and took him to the office to open the safe.   A firearms expert for the prosecution testified that there are two ways of firing a revolver: single action and double action.  In the single action method, the hammer is pulled back first and then the trigger is pulled to fire the weapon.  In the double action method, the trigger is pulled which first draws the hammer back and then drops the hammer on the ammunition.  The expert was not asked whether or how a revolver could discharge accidentally, nor did Goodwin's counsel put on any proof on this question.  In either the single action or the double action method, however, the trigger must be pulled.  Further, the location of the fatal wound works against a finding that the shooting was accidental. There was thus  no evidence from which a jury could reasonably conclude that Goodwin proximately, but not intentionally, caused the revolver to fire.  *See Hopper*, 456 U.S. at 610; *Campbell*, 260 F.3d at 541; *Thomas*, 533 N.E.2d at 289-91.

Accordingly, there was no basis for the jury to reasonably conclude that Goodwin committed the robbery but lacked the purpose to kill the victim.  Goodwin was therefore not entitled to an instruction on the lesser included offense.  Because Goodwin's underlying claim lacks merit, he cannot rely on ineffective assistance of counsel to excuse his default of this claim.  *See Edwards*, 529 U.S. at 451; *McFarland*, 356 F.3d at 699-700.  It follows, in other words, that the claim is procedurally defaulted, precluding relief on the merits; but even if we were to reach the merits, they would be found wanting.

### E.  Ineffective Assistance of Counsel at Sentencing

Next, we turn to the Warden's challenge to the district court's award of habeas relief to Goodwin on one of his claims.  Goodwin contends his trial counsel rendered ineffective assistance at sentencing by failing to gather records, interview family members, or otherwise investigate Goodwin's background for potential mitigating evidence, by failing to obtain the services of a psychologist and neuropsychologist, and

by relying improperly on residual doubt in mitigation. An attorney's failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003). Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability, and family relationships. *Powell v. Collins*, 332 F.3d 376, 399 (6th Cir. 2003). "In assessing the reasonableness of an attorney's investigation, however, the court not only considers the quantum of evidence already known to counsel, but also whether that evidence should lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. When counsel abandons an investigation of the defendant's background after having acquired only a rudimentary knowledge from a narrow set of sources, this choice is not a "strategic decision" and does not constitute the reasonable investigation required by *Strickland*. *Wiggins*, 539 U.S. at 527-28. "[S]trategic choices made after less than a complete investigation are reasonable precisely to the extent that a reasonable professional judgment supported the limitations on the investigation." *Id.* at 528 (quoting *Strickland*, 466 U.S. at 690-91).

The district court permitted discovery and held an evidentiary hearing on Goodwin's ineffective assistance of counsel claim. The court held that Goodwin's trial counsel's mitigation investigation was inadequate and that the Ohio Court of Appeals' and the Ohio Supreme Court's contrary conclusion was the product of an unreasonable application of *Strickland*. The court found that Goodwin's counsel had little contact with Goodwin and his family, that they did not obtain school, medical, and family history records, and that their investigation was insufficient to make strategic decisions. The court noted that although Goodwin's counsel declined to present mitigation evidence in an effort to avoid opening the record to evidence of Goodwin's prior criminal history, the record does not substantiate counsel's presumption that Goodwin had been involved in five armed robberies. The court further found that counsel's residual doubt strategy was deficient because Goodwin confessed to the police and an inmate, witnesses identified Goodwin as the shooter, and the jury had found that

Goodwin was the shooter in the guilt phase. The district court thus concluded that Goodwin's counsel's choice to rely on residual doubt, uninformed by a reasonable mitigation investigation, was not the result of a strategic choice between considered alternatives.[2] Ultimately, the court held that Goodwin was prejudiced by deficiencies in his counsel's performance because Goodwin was denied a meaningful opportunity to present a mitigation case. The Warden challenges this ruling, contending the Ohio courts did not unreasonably apply established federal law in denying Goodwin post-conviction relief.

### 1. *Mitigation Presentation in Sentencing Phase*

At the close of the guilt phase, Goodwin's trial counsel declined a court-ordered presentence report and psychiatric evaluation because "there [was] nothing psychiatrically wrong with him." Counsel also chose not to present any evidence in the mitigation phase. Patrick D'Angelo explained to the trial judge that they had thoroughly prepared and evaluated the case, spoken to Goodwin and his family, and decided it would be problematic to put on evidence because of the risk of opening the door to otherwise inadmissible negative evidence. Lead attorney Thomas Shaughnessy explained that the prosecution had evidence that Goodwin was involved in five prior aggravated robberies. In his closing argument, Shaughnessy discounted Goodwin's youth as a mitigating factor. He also explained that he would not use psychiatrists, psychologists, and social workers because it would insult the jury's intelligence to suggest one should get away with killing another because of a disadvantaged background. Instead of presenting proofs in mitigation, Shaughnessy emphasized that there were two other admitted participants in the robbery. He appealed to any residual doubt the jurors had as to whether Goodwin was the shooter and urged them to consider proportionality in sentencing, observing that Padgett and Johnson would be eligible for

---

[2]The court also recognized that Goodwin's counsel erred by arguing that the jury should not base their sentencing decision on Goodwin's age, but held this deficiency did not result in prejudice warranting relief because the trial court properly instructed the jury that Godwin's youth was a statutory mitigating factor. Nonetheless, the district court recognized this deficiency as one more indication that counsel's performance at sentencing fell below reasonable standards. The district court's ruling on counsel's suspect treatment of Goodwin's age is not at issue in this appeal.

parole after nine and a half years. Conceding that Goodwin was guilty of aggravated robbery and aggravated murder as an aider and abettor, but contending Goodwin was not the shooter, Shaughnessy urged the jury to recommend a sentence of life imprisonment without possibility of parole until after thirty years' imprisonment.

Goodwin's aunt, Rosetta Goodwin, spoke in court after the jury returned its death sentence recommendation but before the trial court sentenced him. Rosetta Goodwin said that Goodwin did not deserve the death penalty because he was born drug-dependent and he was abandoned by his mother when he was nine. Goodwin also addressed the court at the time of sentencing. He apologized to the family of Mustafa Sammour. He confessed that he was responsible for taking Mustafa's life, but insisted he had no intent to do so. Goodwin claimed the gun went off when he hit Mustafa with it, in an effort to get Mustafa to take him to the safe.

### 2. *Mitigation Evidence in Post-Conviction Proceedings*

In his post-conviction petition, Goodwin contended that his trial counsel failed to obtain information about him, failed to obtain reports and evaluations from appropriate experts to use as evidence and render advice, failed to interview family members, relatives and friends who could have provided background information and testified at the mitigation hearing, and failed to provide sound advice to Goodwin regarding the existence and presentation of mitigating factors. The exhibits Goodwin attached to his post-conviction petition included an affidavit by an attorney expressing his opinion regarding the performance of Goodwin's trial counsel at sentencing, reports from an investigator hired by Shaughnessy, jail visitation records, an affidavit by an employee of the Ohio Public Defenders' Commission concerning Shaughnessy's use of mitigating evidence in capital cases, an affidavit by Dr. Jeffery Smalldon, a forensic clinical psychologist, an affidavit by Goodwin's aunt Rosetta Goodwin, an affidavit by Goodwin's mother Callie Goodwin, an affidavit by Goodwin's sister Mary Goodwin, an affidavit by Goodwin's neighbor Sharon Hickerson, an affidavit by Goodwin's friend Carmaletta Hickerson, an affidavit from Goodwin's friend Tranita Ivory, an affidavit from mitigation specialist Dorian Hall, a psychological evaluation of Goodwin

performed by the Mental Development Center at Case Western Reserve University in 1990, Goodwin's juvenile court records, Goodwin's medical records, Goodwin's mother's medical records, a substance abuse assessment, Goodwin's educational records, and other materials.

In the district court, the parties deposed clinical psychologist Dr. Laurel Schauer, psychologist Dr. James Eisenberg, attorney Patrick D'Angelo, mitigation supervisor Dorian Hall, investigator David Hicks, and psychologist Dr. Jeffrey Smalldon. D'Angelo, Hall, and Smalldon also testified in the evidentiary hearing held by the district court.

D'Angelo testified in deposition that Goodwin's case was a terrible one from the defense standpoint because Goodwin confessed, his accomplices identified him as the shooter, and the surviving clerk witnessed the crimes. D'Angelo and Shaughnessy unsuccessfully lobbied the prosecutor to remove the death penalty as a possible punishment. According to D'Angelo, there was nothing about Goodwin's demeanor or interaction with counsel that indicated the existence of a psychiatric issue, so they did not think a psychiatrist was needed. D'Angelo testified that they did not have Goodwin evaluated independently, did not know his IQ, and did not review his school records. D'Angelo recalled that trial counsel spoke with members of Goodwin's family, but could not identify which ones.

D'Angelo stated that Shaughnessy determined that residual doubt was the best strategy to save Goodwin's life. He was concerned that presenting mitigating evidence about Goodwin's background could open the door to the admission of Goodwin's juvenile record. Shaughnessy believed the prosecutor was lining up witnesses to testify about five robberies Goodwin had committed. When asked why Shaughnessy told the jury to disregard Goodwin's age and background, D'Angelo said the strategy was to gain credibility with the jury and avoid the possibility that the jury would see Goodwin's past as predictive of his later behavior. D'Angelo testified to similar effect at the evidentiary hearing in the district court.

Goodwin's aunt, Rosetta Goodwin, stated in her affidavit that she believed Goodwin's mother, Callie (Rosetta's sister), used drugs when she was pregnant with Goodwin and that he was born with a drug addiction. She stated that Goodwin was abused by his father and his step-father. Aunt Rosetta took Goodwin in when his mother kicked him out at age twelve. She had begun fighting for custody of Goodwin when he was eleven and was finally awarded custody when he was seventeen. Rosetta wanted to testify at the penalty phase, but Shaughnessy refused to permit it. Shaughnessy spoke to her only twice, and no investigators contacted her.

Goodwin's mother admitted using marijuana from age twelve and alcohol from age eighteen. She said that Goodwin's father was an alcoholic, mentioned Goodwin's need for intestinal surgery shortly after birth, and stated that Goodwin's father was in prison from the time Goodwin was three until he was a teenager. No one from Goodwin's defense team contacted her. Goodwin's sister reported that their mother used cocaine a few times, but was "always either drinking or smoking marijuana." She stated that she and Michael had witnessed their mother being beaten and abused by various male friends. No one from Goodwin's defense team contacted her. Neighbors and friends described incidents from Goodwin's childhood and said that no one contacted them about Goodwin's trial.

The juvenile court records collected extend from April 1988 to January 1992. The records describe both Goodwin's offenses and his home life. Probation officers found that his mother was unable to care for or manage him because of her drug use, that his step-father had abdicated all responsibility, and that he did better in his aunt's custody but later defied her discipline. During this period, Goodwin was found to have trafficked in drugs, stolen cars, abused alcohol, acted out in school, failed to appear in court, gone "AWOL" from a juvenile detention center, and participated in a gang. The only formal delinquency adjudication in the record stems from Goodwin's court appearance on April 1, 1991, when he faced charges of aggravated burglary, aggravated robbery, drug abuse, and receiving stolen property. Assisted by counsel, Goodwin had admitted responsibility for amended charges of criminal trespass, drug abuse, and

robbery.  Finally, a substance abuse assessment was prepared in January 1992 by the youth services department in connection with a charge of robbery.  The assessment concluded that Goodwin had a serious drug problem and needed treatment.

Goodwin's education records include a psychological report prepared in January 1989, when Goodwin was fourteen.  The report indicated that Goodwin had an IQ of seventy-three and would be expected to perform at a level considerably lower than same-aged peers.  His reading and math skills fell in the second, third, and fourth grade range. The record also contains a special education evaluation from January 1989, an Individualized Education Program report from 1991, and report cards showing excessive absences and failing grades.

Clinical psychologist Laurel Schauer testified in deposition that she examined Goodwin in 1990 when he was fifteen years old in connection with a juvenile court case. She noted that Goodwin was in developmentally handicapped classes at school but was not attending regularly and was doing poorly.  Dr. Schauer administered psychological tests and found that Goodwin was in the borderline range of intellectual functioning, having an IQ of between seventy and eighty-five.  Dr. Schauer recommended a strong intervention and remediation program.  Her primary diagnosis was conduct disorder, noting that Goodwin took and sold drugs and went joy riding in cars.  Dr. Schauer suggested the possibility of dysthymia (despondency), although Goodwin denied being depressed and she found no reason to suspect major depression.

Dr. James Eisenberg, a clinical and forensic psychologist with significant experience in capital cases, reviewed records associated with Goodwin's case but did not examine him.  Dr. Eisenberg testified to the significance of Goodwin's school records, family background, and psychological assessments, all of which, in his opinion, indicated "severe emotional and psychological and intellectual impairment."  He believed the records substantiated the necessity of retaining the services of a psychologist, psychiatrist, social worker or other mitigation specialist to prepare for the sentencing phase of a capital case.  Having had prior experience with Goodwin's lead

counsel Thomas Shaughnessy, Dr. Eisenberg characterized his attitude toward the mental health profession as one of "disdain and distrust."

Dorian Hall, a licensed social worker with the Ohio Public Defenders' Commission, testified in deposition as a mitigation specialist. She testified about how mitigation investigations should be performed and described the records she reviewed in Goodwin's case. Hall supervised the post-conviction mitigation investigation in Goodwin's case, but did not speak to Goodwin or his family. At the evidentiary hearing, the district court accepted Hall as an expert witness. She testified that a mitigation investigation should begin three months before jury selection, and should include talking to people who know the defendant and collecting records about him. Hall stated that the information gathered about Goodwin's background in post-conviction proceedings, evidencing a dysfunctional family background and an IQ between mental retardation and low level intelligence, indicated a need for a psychologist to assist in preparing for mitigation.

Dr. Jeffrey Smalldon, clinical psychologist and forensic consultant, testified in deposition that he was asked to review Goodwin's case in 1996. He reviewed Goodwin's medical, educational, and juvenile court records; interview summaries prepared by the Ohio Public Defenders' staff; newspaper clippings; the report prepared by Dr. Schauer; and Goodwin's mother's medical records. In assessing Goodwin's childhood environment, Dr. Smalldon considered it significant that Goodwin's mother had been a victim of incest when she was only eleven or twelve, had become pregnant with Goodwin's older half-sister after being raped by her father, and gave birth to Goodwin when she was just sixteen. The records showed that she had an extensive history of alcohol and drug abuse, prostitution, and unstable relationships with men before kicking Goodwin out of the home, in his underwear on a rainy night, at around age twelve. He never returned. Goodwin's father's influence in his life was no better. Dr. Smalldon noted that he was never married to Goodwin's mother and was in and out of prison throughout Goodwin's formative years. He engaged in drug abuse and antisocial behavior. There was evidence that he once had one of his girlfriends perform

oral sex on Goodwin when he was just five years old. The father died when Goodwin was sixteen.

Dr. Smalldon met with Goodwin three times, comprising some ten to twelve "face-to-face hours," and administered several psychological assessments. Goodwin reluctantly disclosed to him that he had been subjected to multiple episodes of sexual abuse by an older male relative when he was seven to nine years old. Goodwin frequently witnessed violence between his mother and her various boyfriends. He also reported having been beaten over the years with chains and leather straps by multiple adults who moved in and out of the family household.

Dr. Smalldon found that Goodwin's IQ was on the borderline between mild mental retardation and low average intelligence. He noted that Goodwin was identified as developmentally handicapped and left school in the tenth grade, although his achievement results reflected intellectual functioning at the third or fourth grade level. Dr. Smalldon noted that Goodwin had significant learning problems that were not helped by his chaotic home life, where he was exposed to physical and sexual abuse. Dr. Smalldon concluded that Goodwin would have been very immature at age nineteen. Dr. Smalldon also found that Goodwin showed signs of mild organic brain impairment, possibly caused by poor prenatal care, blows to the head, failure to thrive as an infant, and use of alcohol and drugs. Dr. Smalldon explained that Goodwin's problems would lead to difficulties generating effective problem-solving strategies, deficits in self-regulation, increased impulsivity, and problems in abstract concept formation. Considering his poor adaptive skills, his intellectual deficits and his chaotic family background, Dr. Smalldon stated that Goodwin's age should have been viewed as a significant factor in evaluating his ability to make judgments with an eye toward the long-term future. In his opinion as a forensic psychologist, the mitigation investigation and presentation in Goodwin's case fell below minimal levels of acceptability.

### 3. *Deficient Performance*

Initially, we note that Goodwin's trial counsel's reliance on the residual doubt strategy at the penalty phase was not deficient performance per se. *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (recognizing the strategy as "an extremely effective argument for defendants in capital cases"). Residual doubt was recognized as a valid mitigation theory in Ohio at the time of Goodwin's trial, but has since been rejected by the Ohio Supreme Court. *See State v. McGuire*, 686 N.E.2d 1112, 1123 (Ohio 1997). Moreover, there was some evidence to support Shaughnessy's argument that Goodwin was not the trigger man, and that Padgett and Johnson agreed to testify against Goodwin to avoid the death penalty. Accordingly, had counsel's choice to rely on residual doubt been an informed one, it may have been the best decision under the circumstances. *See Scott v. Mitchell*, 209 F.3d 854, 881-82 (6th Cir. 2000) (noting in dicta that the decision to pursue the residual doubt strategy was not unreasonable where counsel conducted research into the available mitigating testimony and wanted to avoid opening the door to evidence of the petitioner's extensive criminal history).

In this case, however, Goodwin's trial counsel chose to rely on residual doubt without conducting an adequate investigation of Goodwin's background. D'Angelo and Shaughnessy told the trial court that they had thoroughly prepared and evaluated the case and had spoken to Goodwin and his family before deciding not to present mitigation evidence. However, only Goodwin's aunt said that she had spoken to counsel.[3] The rest of Goodwin's family—including his mother, his sister, his neighbor, his friend, and the mother of his child—testified that at no time during the trial did attorneys or investigators try to contact them or ask them to testify on Goodwin's behalf. Indeed, D'Angelo had only a limited recollection of conversations with some family members. D'Angelo later conceded that defense counsel did not review Goodwin's school records, did not have him evaluated, and did not go to family members' homes to interview them.

---

[3]Goodwin's aunt testified that, "Mr. Shaughnessy only spoke to me two times during the trial and no investigators came to see me or anyone else in my family concerning Michael's case." (J.A. 402.) Furthermore, Goodwin's aunt did speak at Goodwin's sentencing before the judge, but she stated that Goodwin's "attorneys did not prepare me for this and I was very nervous."

Had Goodwin's counsel interviewed Goodwin's family, they would have learned that he was neglected by his drug-using mother and physically and sexually abused by others. Had they examined his school records, they would have learned about his poor school performance and low IQ. Had counsel examined Goodwin's juvenile court records, they would have learned of his psychological problems and how his chaotic home life contributed to his delinquency. All of this information, in turn, would have suggested the need to have Goodwin psychologically evaluated.

The information Goodwin's counsel possessed, obviously incomplete, should have triggered a more thorough investigation of Goodwin's past. Indeed, an examination of his past records, or further investigation with family members, would have revealed and corroborated the true extent of Goodwin's past difficulties and provided a wealth of mitigation evidence. The decision of Goodwin's trial counsel to forgo further investigation after the limited investigation they undertook was not an exercise of reasonable professional judgment, because trial counsel had little knowledge of Goodwin's background and the knowledge they did have should have triggered further investigation. Their decision not to present a mitigation case at all, without conducting a reasonable investigation to determine what mitigation evidence might be available, was clearly constitutionally deficient. *See Sears v. Upton*, — U.S. —, 130 S.Ct. 3259, 3262-64 (2010) (counsel's performance deemed deficient where they failed to discover evidence that defendant had grown up in an abusive home environment, had been sexually abused by a male cousin, was learning disabled, suffered from pronounced frontal lobe pathology, and had diminished judgment and reasoning skills); *Porter v. McCollum*, — U.S. —, 130 S.Ct. 447, 453 (2009) (counsel's performance deemed deficient where defendant's school, medical and military service records were not obtained and family members not interviewed); *Rompilla v. Beard*, 545 U.S. 374, 383-90 (2005) (where defendant refused to cooperate with mitigation investigation, counsel had detailed discussions with family members, and counsel reviewed three mental health experts' reports, investigation nonetheless deemed inadequate for failure to explore school records, prior criminal record and history of alcohol abuse); *Wiggins*, 539 U.S. at 527-28 (counsel's decision not to present mitigation proofs after inadequate

investigation held deficient); *Mason v. Mitchell*, 543 F.3d 766, 780 (6th Cir. 2008) (partial but incomplete mitigation investigation deemed inadequate); *Jells v. Mitchell*, 538 F.3d 478, 493-97 (6th Cir. 2008) (same). Thus, defense counsel's decision to rely on residual doubt and not present any mitigation evidence to the jury, although based on the belief that the jury would be more receptive to residual doubt and proportionality arguments, was reached without complete knowledge of Goodwin's mental health status and family background and was objectively unreasonable.

Goodwin's counsel's assessment that presenting mitigation evidence would have opened the door to evidence that he committed five aggravated robberies was uninformed and apparently erroneous. First, as the district court noted, the juvenile court documents in the record do not show that Goodwin was ever even charged with five aggravated robberies. Because counsel waived Goodwin's right to preparation of a presentence report, the nature and extent of Goodwin's prior involvement in criminal activity appears not to have been ascertained. Neither Shaughnessy at the time of trial, nor D'Angelo in post-conviction proceedings, indicated that they actually reviewed Goodwin's criminal record. Shaughnessy appears to have believed the prosecution had evidence that Goodwin had been involved in five aggravated robberies, but the record does not substantiate this belief. The record shows that Goodwin was charged in three complaints in 1990 and 1991 with: (a) receiving stolen property; (b) receiving stolen property and aggravated robbery; and (c) aggravated burglary and drug abuse. Goodwin admitted committing, and was only adjudged delinquent on, two charges of robbery and one charge of criminal trespass.

It thus appears that Goodwin's counsel based their decision to forgo presenting mitigation evidence on incomplete, erroneous information and unsupported supposition. A reasonable investigation would have disclosed that the risk of opening the door to evidence of Goodwin's juvenile delinquency was not nearly as great as presumed. Had counsel obtained accurate information, they might very well have employed a different approach to mitigation in the sentencing phase. To the extent their choice was instead based on incomplete knowledge of Goodwin's record of delinquency, their decision was

not strategic.  *See Wiggins*, 539 U.S. at 527-28.[4]  Consequently, it was not an informed decision, and defense counsel's performance at sentencing was inadequate.

The Ohio Court of Appeals, the last state court to assess the sufficiency of trial counsel's mitigation investigation, considered the "new evidence" presented by Goodwin in collateral proceedings.  *See Goodwin*, 1999 WL 342305.  This new evidence included evidence that Goodwin: was borderline mentally retarded and showed signs of organic brain impairment; had a low education level; was involved in gang and criminal activity from a young age; had an unstable home life and was exposed to drug use, alcoholism, and prostitution by his mother before she forced him out of the home; was neglected and abused by his step-father; and had been exposed by his father to sexual abuse, drug use, and criminal behavior.  The Ohio Court of Appeals held this was essentially the same sort of evidence as the mitigation evidence presented on direct appeal (i.e., relating to Goodwin's drug-dependent birth, mental abuse by his mother, and physical problems stemming from an intestinal birth defect).  The court therefore declined to revisit the determination made on direct appeal that Goodwin's trial counsel had made a reasonable tactical decision to not present mitigating evidence.  *Id.* at *6-7.

However, this new evidence is clearly not the same.  The wealth of affidavits and new information presented in collateral proceedings show that, while Goodwin's trial

---

[4]Moreover, it is possible that Goodwin's counsel could have presented evidence concerning Goodwin's IQ, his psychological problems, and the abuse and neglect he suffered without opening the door to evidence of his juvenile delinquency—as long as no defense witness misrepresented Goodwin's criminal history.

Under Ohio law, the prosecution is entitled to rebut mitigating factors asserted by the defendant or false or incomplete statements regarding the defendant's criminal record.  *State v. Gumm*, 653 N.E.2d 253, 257 (Ohio 1995); *State v. DePew*, 528 N.E.2d 542, 555 (Ohio 1988).  This court has interpreted Ohio law similarly.  *See Durr v. Mitchell*, 487 F.3d 423, 436-37 (6th Cir. 2007); *Carter v. Mitchell*, 443 F.3d 517, 531-32 (6th Cir. 2006).  However, where neither the defendant nor any mitigation witness misrepresents the defendant's criminal history, it is improper for the prosecutor to rebut the mitigation through evidence of defendant's criminal history.  *See Mason v. Mitchell*, 543 F.3d 766, 781 (6th Cir. 2008); *State v. Durr*, 568 N.E.2d 674, 684 (Ohio 1991).  It follows that Goodwin's counsel, if they presented information about his background without misrepresenting it, would not have opened the door to evidence of Goodwin's juvenile delinquency.

In any event, counsel's assessment of the prejudicial effect of Goodwin's record of delinquency seems exaggerated.  Inasmuch as the jury had already found that Goodwin murdered the store clerk by shooting him in the head at point-blank range, the notion that evidence of Goodwin's involvement in relatively minor robbery offenses as a fifteen-year old would have undermined any mitigation evidence is suspect.  Still, and most importantly, Goodwin's counsel decided not to risk opening the door to evidence of the aggravated robberies without even undertaking a reasonable investigation to determine what mitigating evidence was available.  Because reasonable professional judgment would not support such limitations on the investigation, counsel's choice was not reasonable.  *See Wiggins*, 539 U.S. at 528.

counsel were aware of some limited information, they failed to conduct an investigation that would have quickly revealed much more powerful mitigation evidence—information that was necessary to make a reasonable professional judgment as to whether to present a mitigation defense. It was objectively unreasonable for the state court to conclude that this evidence was substantially similar to evidence presented on direct appeal, and to conclude, after examining the wealth of new mitigating evidence that Goodwin's trial counsel failed to discover, that their performance was adequate. Instead, it is clear that the assistance of counsel Goodwin received in the penalty phase fell below the acceptable standard.

### 4. *Prejudice*

Counsel's performance deficiency warrants relief, however, only if it is shown to have resulted in prejudice. To show prejudice, Goodwin must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). When a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. Thus, Goodwin bears the burden of showing a "probability sufficient to undermine confidence in the outcome," but he does not need to prove that "counsel's unreasonable performance more likely than not altered the outcome in the case." *Id.* (internal quotation marks omitted). To show prejudice resulting from counsel's deficient mitigation investigation, the petitioner must present new evidence that differs both in strength and subject matter from the evidence actually presented at sentencing, not just cumulative mitigation evidence. *Bobby v. Van Hook*, — U.S. —, 130 S.Ct. 13, 19-20 (2010); *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006). In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence, both that

adduced at trial and that adduced in post-conviction proceedings. *See Wiggins*, 539 U.S. at 534-36. Under Ohio law, to establish prejudice, Goodwin need only show "a reasonable probability that one juror would have voted against death had defense counsel presented mitigation evidence." *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006) (citing *State v. Robb*, 723 N.E.2d 1019, 1044 (Ohio 2000)).

The last Ohio court to review the matter was the Ohio Court of Appeals in state post-conviction proceedings. *See Goodwin*, 1999 WL 342305. The court considered the mitigating evidence presented by Goodwin and held that "[t]he evidence that allegedly would have been offered was simply more of the same type of evidence that the Ohio Supreme Court has held does not mitigate the aggravating circumstances of a 'senselessly cruel aggravated murder in the course of an aggravated robbery.'" *Id.* at *6 (quoting and discussing *State v. Williams*, 600 N.E.2d 298, 303 (Ohio App. 8 Dist. 1991)). The court thus concluded that the failure to present mitigation evidence during the penalty phase did not result in prejudice, finding that its decision was largely determined by *State v. Williams* and the state courts' prior determinations on direct appeal. *Id.* at *6. The district court ruled that the Ohio Court of Appeals' decision represented an unreasonable application of *Strickland*. We agree.

First, *State v. Williams* is distinguishable—in terms of both the severity of the aggravating circumstances and the strength of the mitigation proofs. The crime in *Williams* involved multiple blunt force injuries to the head and neck of a seventy-six-year-old woman prior to death by a single gunshot to the victim's face during a robbery of her home; whereas the instant murder, though senseless, did not involve such flagrant and gratuitous brutality. In addition, the new mitigation evidence presented in post-conviction proceedings in *Williams* (involving no evidence of sexual or physical abuse, drug use, abandonment by mother, etc.) was much less powerful than the mitigation evidence presented in post-conviction proceedings in this case. *Strickland* clearly requires an individualized weighing of aggravating and mitigating factors; reliance on a prior, clearly distinguishable decision like *Williams* represents weak support for the Ohio Court of Appeals' determination.

Also unreasonable is the Ohio Court of Appeals' assessment that the "new" mitigating evidence was generally similar to the "old" mitigating evidence presented on direct appeal. The evidence presented in post-conviction proceedings was different from and much stronger than the evidence presented on direct appeal. The old evidence merely showed Goodwin's "drug-dependent birth, mental abuse by his mother, and some sort of physical problem with the development of his intestines at birth." *Goodwin*, 1997 WL 186770 at *9. The new evidence presented in post-conviction proceedings was much more extensive, powerful, and corroborated.

Upon undertaking this reweighing of all the evidence, we find that Goodwin has met his burden of showing he was prejudiced by his counsel's failure to present mitigating evidence in the penalty phase. The aggravating circumstance is that Goodwin committed aggravated murder while committing aggravated robbery and either was found to be the principal offender or to have acted with prior calculation and design. More pointedly, the jury heard evidence that Goodwin placed a gun to the head of a compliant victim, Mustafa Sammour, and fatally shot him. The mitigation evidence, which was never presented to the jury, showed that Goodwin, nineteen years old at the time of the offense: (1) was borderline mentally retarded; (2) had a low educational level and was involved in criminal activity at a young age; (3) showed signs of organic brain impairment that resulted in diminished judgment and impulse control; (4) had an unstable home life and was raised by a young mother whose life was fraught with abusive relationships and substance abuse before she forced him out of her home; (5) was physically abused by his mother's boyfriends; and (6) was exposed by his father to sexual abuse, drug use, and criminal behavior before he died. While this reweighing exercise necessarily entails some measure of speculation, *see Sears*, 130 S.Ct. at 3266-67, considering that Goodwin's counsel chose to present no mitigation evidence at all in the penalty phase, after making a clearly inadequate investigation, we have little trouble finding a reasonable probability that at least one juror would have voted against death had defense counsel attempted to humanize Goodwin by presenting evidence of the hardships and disadvantages he faced growing up.

This is not a case in which the new evidence "would barely have altered the sentencing profile presented to the sentencing judge [and jury]." *Porter*, 130 S.Ct. at 454 (quoting *Strickland*, 466 U.S. at 700). At Goodwin's original sentencing, like Porter's, the judge and jury "heard almost nothing that would humanize [Goodwin] or allow them to accurately gauge his moral culpability." *Id.* Had Goodwin's counsel conducted a reasonable mitigation investigation and made an informed decision about the penalty phase strategy, there is a reasonable probability they would have presented evidence of the kind of troubled history the Supreme Court has declared "relevant to assessing a defendant's moral culpability." *Id.* (quoting *Wiggins*, 539 U.S. at 535); *see Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse."). In *Porter*, the Court went on to hold that counsel's failure to discover and present mitigation evidence remarkably similar to the evidence here at issue (i.e., evidence of defendant's history of childhood physical abuse, brain abnormality, difficulty reading and writing, and limited schooling) resulted in cognizable prejudice under *Strickland*. *Id.* Moreover, in reweighing the evidence, the Court noted the importance of measuring the seriousness of the aggravating circumstances in assessing the probability that the new mitigating evidence would tip the scale in favor of a different outcome. *Id.* It follows that where, as here, the murder committed by Goodwin, though senseless and deplorable, was not otherwise especially heinous or atrocious, the probability that the new evidence would tip the balance is commensurately greater.

The circumstances of this case are similar to those that the Supreme Court has held sufficient to make out the requisite showing of prejudice. In *Williams v. Taylor*, 529 U.S. 362 (2000), after Williams' victim refused to give him money, Williams "wanted to get back at him." *Id.* at 368. To do this, Williams went into the bathroom, found a mattock (a sort of pickaxe) and struck his victim on the chest and the back with it while he lay on his bed. Williams then took the victim's wallet. The Court noted that "the graphic description of Williams' childhood, filled with abuse and privation, or the

reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id.* at 398. Here, as in *Williams*, the mitigation evidence showed that Goodwin endured a childhood filled with abuse and privation and that he was borderline mentally retarded.

In *Wiggins*, defense counsel failed to discover and present "powerful" mitigating evidence showing that the defendant "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother;" that he "suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care;" that he had "diminished mental capacities" and was homeless for a period of time. 539 U.S. at 535. The Court concluded that, "had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id.* at 536.

In this case, the mitigation evidence showed that Goodwin also faced severe privation and abuse in the early years of his life and while in the custody of his alcoholic and drug using mother. There was evidence that he was frequently beaten, sexually molested , and abandoned by both of his parents. In addition, Goodwin was kicked out of his home and, consequently, got involved with criminal activity. *Wiggins*, in particular, shows that the weighing conducted by the Ohio Court of Appeals in state post-conviction proceedings was contrary to *Strickland*. The mitigating evidence in *Wiggins* is not materially distinguishable from that eventually uncovered in Goodwin's case. Furthermore, the aggravating circumstances against which the mitigating evidence must be weighed are comparable in both cases—Wiggins having drowned an elderly woman and Goodwin having shot a non-resisting store clerk.

Our own circuit precedents also support our finding that Goodwin was prejudiced by his counsel's failure to present this mitigating evidence. Two cases, in particular, are factually analogous. In *Mason v. Mitchell*, the defendant raped and beat a woman to death using a board with protruding nails. 543 F.3d at 769. The court reviewed the Ohio courts' imposition of the death sentence and considered mitigating evidence showing that:

> Mason's father ran a prostitution ring for three years, that he operated a home-based drug business with ten employees selling drugs for him, that both of Mason's parents were daily drug users as well as traffickers, that Mason's mother shot his father because of his involvement with prostitution, and that Mason's parents regularly abused Mason and isolated all of their children from anyone not associated with the parents' drug dealing activities. . . . Further, the evidence demonstrated that Mason had experimented with drugs as an eight-year-old, that Mason's father took him along on trips to purchase and sell drugs while Mason was in the sixth and seventh grades, and that Mason had a borderline personality disorder largely as a result of his dysfunctional home environment.

*Id.* at 780. Noting the similarity between these factors and the Supreme Court's decision in *Williams*, the *Mason* court found that there was sufficient prejudice because "Mason has demonstrated a reasonable probability that, had his counsel presented the mitigating evidence introduced at the evidentiary hearing, at least one juror might have been persuaded not to impose the death penalty." *Id.* at 781-83. The *Mason* court held that deferential review under AEDPA did not alter this result even though the Ohio Supreme Court "rejected Mason's claim of ineffective assistance of counsel on the ground that Mason had failed to show prejudice." *Id.* at 785.

Goodwin's undisclosed mitigation evidence is comparable to the mitigation evidence not presented in *Mason*. Its potential for altering the sentencing profile is arguably greater, however, inasmuch as the aggravating circumstances of Goodwin's crime might not be considered as heinous as Mason's rape and brutal bludgeoning of his victim.

In *Jells v. Mitchell*, a man kidnapped a woman and her young son, beat the mother in front of her son, carried her body into a junkyard and left it there, and then dropped her son off at another junkyard. 538 F.3d at 484-86. The court determined that "to the extent that it actually addressed prejudice, the Ohio Court of Appeals unreasonably determined that the alleged errors of Jells's trial counsel did not prejudice Jells's case." *Id.* at 498. The *Jells* court contrasted the evidence presented at the mitigation hearing, which was largely positive, with the withheld evidence, which showed that Jells had serious cognitive learning and socialization impairment; revealed

that Jells had witnessed his mother's multiple abusive sexual relationships; and included expert testimony indicating that Jells's home environment had a profound impact on his psychological development and led to feelings of victimization that added to the frustrations he experienced in school. *Id.* at 500. The *Jells* court concluded there was sufficient showing of prejudice based on counsel's failure to take advantage of undisclosed mitigation information similar to Goodwin's.

Numerous other Sixth Circuit decisions support the conclusion that Goodwin's counsel's inadequate mitigation investigation resulted in cognizable prejudice. *See*, *e.g.*, *Johnson v. Bagley*, 544 F.3d 592, 603-06 (6th Cir. 2008); *Morales v. Mitchell*, 507 F.3d 916, 935 (6th Cir. 2007); *Haliym v. Mitchell*, 492 F.3d 680, 712 (6th Cir. 2007); *Harries v. Bell*, 417 F.3d 631, 639-40 (6th Cir. 2005).

In *Phillips v. Bradshaw*, 607 F.3d 199 (6th Cir. 2010), the petition for habeas relief based on inadequate mitigation investigation was denied for lack of a persuasive showing of cognizable prejudice. The court determined that the undisclosed mitigating evidence of an abusive childhood home environment showed abuse of Phillips's siblings, but not of Phillips himself. *Id.* at 218. The undisclosed evidence was thus deemed not to be substantially different, in strength or subject matter, from the mitigating evidence actually presented at sentencing. *Id.* at 218-19. The court also took note of the "particularly heinous way in which the murder was committed, that is, the brutal beating and anal rape of a three year old girl," and concluded that the presentation of the new evidence would not have so altered the weighing of aggravating and mitigating circumstances as to create a reasonable probability of a different outcome. Here, in contrast, the new evidence, not discovered or presented due to counsel's inadequate investigation, was sufficiently different and weighty, in comparison with counsel's failure to present any mitigation case at all, to create a reasonable probability of a different outcome.

Accordingly, consistent with the above authorities, we concur in the district court's assessment that the Ohio Court of Appeals unreasonably applied *Strickland*'s clearly established requirement that it weigh the aggravating and mitigating

circumstances to determine if there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. After reweighing the evidence in aggravation against the powerful mitigating evidence that was never presented to the jury, we find that it was objectively unreasonable to find that Goodwin was not prejudiced by his trial counsel's performance. Instead, it is reasonably probable that at least one juror would have voted against death had defense counsel presented the new mitigation evidence. Accordingly, we find no error in the district court's determination that Goodwin was prejudiced by his counsel's failure to present this mitigating evidence.

## III.  CONCLUSION

In accordance with the foregoing analysis, we affirm the judgment of the district court on all issues presented in this appeal. Specifically, the district court's denial of habeas relief on petitioner Goodwin's claims of ineffective assistance of counsel in the guilt phase, insufficient evidence of prior calculation and design, and failure to instruct the jury on the lesser included offense of involuntary manslaughter, is **AFFIRMED**. In addition, the district court's award of habeas relief on Goodwin's claim that he was denied effective assistance of counsel in the penalty phase, is **AFFIRMED**. The matter is therefore **REMANDED** to the district court for issuance of an order conditionally granting the writ unless the State of Ohio commences a new sentencing proceeding within 180 days from the date this judgment becomes final.