RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0411p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANTHONY L. SAXTON,

    *Petitioner-Appellant,*

  *v.*

MICHAEL SHEETS, Warden,

    *Respondent-Appellee.*

No. 07-3706

---

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 06-00306—Donald C. Nugent, District Judge.

Argued: October 31, 2008

Decided and Filed: November 20, 2008

Before: CLAY, GILMAN, and ROGERS, Circuit Judges.

---

COUNSEL

ARGUED: Theresa G. Haire, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. William H. Lamb, OFFICE OF THE OHIO ATTORNEY GENERAL, Cincinnati, Ohio, for Appellee. ON BRIEF: Theresa G. Haire, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Gregory T. Hartke, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

  RONALD LEE GILMAN, Circuit Judge. The sole issue in this habeas appeal is whether there was sufficient evidence to convict Anthony Saxton of aggravated murder, aggravated arson, and aggravated burglary. He was sentenced by the state trial court to serve 38 years to life in prison. Although the prosecution called 57 witnesses against Saxton at trial, there was no testimonial or physical evidence that placed him at the scene of the crime. The state trial court acknowledged the weakness of the evidence against Saxton, but denied his motion for acquittal. The Ohio Court of Appeals affirmed, concluding that a rational trier of fact could have found him guilty beyond a reasonable doubt. After exhausting his state-court remedies, Saxton filed a petition for a writ of habeas corpus. The district court, adopting the magistrate judge's recommendations, denied his petition. We granted a certificate of appealability solely on the sufficiency-of-the-evidence issue. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

1

# I. BACKGROUND

## A.　Factual background

In the early morning of July 7, 1999, a fire broke out in the residence of 19-year-old Taranda Braddy in Marion, Ohio. The fire was confined to the upstairs portion of the house, where Braddy's bedroom was located. After most of the fire was extinguished by the local fire department, Braddy's partially burned body was found lying across the mattress in her bedroom. The coroner determined that she had died of asphyxia caused by strangulation before gasoline was poured on her body and around the room, and a fire set. Braddy had lived with her grandmother, who was out of town with Braddy's mother attending a family gathering. There was no sign of sexual assault or struggle, nor signs of forced entry on either the front or the back door.

The investigation of the police quickly focused on Braddy's stepfather Anthony Saxton, who arrived later that morning at the scene. Saxton had quarreled with Braddy's mother, Pamela Saxton (Pam), four days earlier. The argument concerned whether Pam would leave her car for Saxton to drive while she was out of town for the family gathering. Pam had decided not to leave the car with Saxton because he did not have a valid driver's license. Instead, she took the car to Braddy's home and left the car keys in a purse locked in the bedroom of Pam's mother. Pam had told neither Saxton nor Braddy about the location of the keys.

Saxton was approached by investigating officers at the crime scene. He became a suspect after they questioned him, and the officers obtained a warrant to search his residence several hours later. He was arrested that afternoon for an unrelated parole violation. At Saxton's residence, which was located less than a mile from Braddy's house, the police found clothing soaking in the bathtub with a nearly empty bottle of Purex next to the tub. The officers testified that they smelled gasoline in the bathroom. A crime lab later found traces of gasoline on either a pair of shoes or a pair of denim shorts collected from the bathtub, but could not tell which because the shoes and the shorts were placed together in one bag. Gasoline traces were not found on the other clothes or in the water sample that the officers took from the tub. When the police questioned him, Saxton gave inconsistent statements about when the clothes had been placed in the tub and why.

The police noticed a bicycle track in the dew on the grass that led from the front of Braddy's house to the dirt alley in the back. Later that day, a stolen bicycle was recovered four houses away from Saxton's residence. Plaster casts of tire tracks made in the alley running behind the victim's house closely resembled one of the tires on the stolen bike. A blue cotton fiber consistent with denim material was found on the seat of the bicycle. A witness saw a black man in long pants and dark clothing riding a bicycle at 6:00 a.m. in the direction of Saxton's home. The witness could not identify Saxton.

## B.　Procedural history

### 1.　*Procedural history in the state courts*

Saxton was indicted on one count of aggravated murder, one count of aggravated burglary, and one count of aggravated arson. After a two-week jury trial, he was convicted on all counts. He filed a motion for acquittal and a motion for a new trial, arguing that the conviction was not supported by sufficient evidence and was the product of prosecutorial misconduct. Both motions were denied after a hearing. The state trial court acknowledged that

> [t]here was no direct evidence in this case which could place the defendant at the scene. There was no direct evidence that the defendant personally committed any act necessary to the offenses of burglary, murder or arson. Only circumstantial evidence was offered . . . . While there were 57 witnesses presented by the state,

much of the testimony was mere foundation, with no direct materiality to the issue of guilt . . . .

This case was tried on the quantity of the evidence, not the quality. Much of the physical evidence was mishandled, and the testimony of several witnesses who handled that evidence was contradictory as to who did what and how. . . .

The danger in such cases is that the fact-finder will make an inference upon inference, or multiple inferences. This clearly would be improper.

Nonetheless, the trial court determined that "without a full transcript and a considerable delay in time," it "cannot now make any better judgment on the sufficiency of the evidence than [it] did at trial . . . . [T]he court will not trust its memory of the testimony to make such a decision and reverse a jury verdict." The court therefore decided that "[t]he reviewing court with a complete record will be better able to review such issues."

Saxton timely appealed to the Ohio Court of Appeals, raising nine issues that included insufficiency of the evidence, prosecutorial misconduct, and ineffective assistance of counsel. A three-judge panel rejected each of Saxton's claims and affirmed his conviction. The majority opinion found that "a rational trier of fact could have concluded that Appellant committed the crimes for which he was convicted beyond a reasonable doubt." *State v. Saxton*, No. 9-2000-88, 2002 Ohio App. LEXIS 1020, at *14 (Ohio Ct. App. Mar. 7, 2002). Judge Bryant dissented. Although he found that after "[g]iving every benefit of every doubt to the State, a reasonable person might conclude that Saxton committed the offense," he nonetheless would reverse because the convictions were against the manifest weight of the evidence. *Id.* at *63. Saxton, through new counsel, filed a timely appeal with the Ohio Supreme Court, which dismissed the case as not involving any substantial constitutional question. There was no further appeal from that decision.

While Saxton's direct appeal was pending in the state courts in 2001, he filed a petition for state postconviction relief, claiming ineffective assistance of counsel. The trial court granted summary judgment for the government. On appeal, the Ohio Court of Appeals at first reversed the trial court's grant of summary judgment, then vacated that decision and affirmed the trial court's denial of postconviction relief upon the state's motion for reconsideration. The Ohio Supreme Court dismissed Saxton's further appeal as not involving any substantial constitutional question. There was no further appeal from that decision.

### 2. *Petition for writ of habeas corpus*

In February 2006, Saxton filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio. He raised five grounds for relief, including insufficiency of the evidence, prosecutorial misconduct, and ineffective assistance of counsel. The district court rejected each of his claims and dismissed the petition. With respect to Saxton's insufficiency-of-the-evidence claim, the court quoted the state appellate court's factual findings in their entirety, then concluded without discussion that "Saxton fail[ed] to demonstrate by clear and convincing evidence that the state court erred in finding that a rational finder of fact could have concluded beyond a reasonable doubt that he had committed the crimes for which he was convicted." In addition, the court denied Saxton a certificate of appealability on any of his grounds for relief. Saxton appealed, and this court granted a certificate of appealability solely on the issue of whether the evidence against him was sufficient to support his convictions.

## II. ANALYSIS

### A.      Standard of review

We review de novo a district court's decision to grant or deny a petition for a writ of habeas corpus.  *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006).  Both the district court and this court are bound to apply the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) in this case because Saxton filed his petition after AEDPA's effective date. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003).  Under AEDPA, a federal court may grant a writ of habeas corpus with respect to a "claim that was adjudicated on the merits in State court proceedings" if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  "A state-court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent." *Joseph,* 469 F.3d at 449-50 (brackets, citations, and internal quotation marks omitted).  On the other hand, a state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000), or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Joseph*, 469 F.3d at 450 (citation and internal quotation marks omitted).

A conviction is supported by sufficient evidence if, when "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).  In a habeas proceeding, however, we cannot simply conduct a de novo review of the state court's application of that rule, but must review its sufficiency-of-the-evidence decision under the highly deferential standard of AEDPA.  Saxton can be granted habeas relief only if the Ohio Court of Appeals unreasonably applied the *Jackson* standard. *See Getsy v. Mitchell*, 495 F.3d 295, 315-16 (6th Cir. 2007) (en banc) ("Whether [the petitioner] is entitled to habeas relief ultimately depends on whether the [state court]'s denial was based on an unreasonable application of clearly established federal law regarding the sufficiency of the evidence.").  Our task is "to determine whether it was objectively unreasonable for the [state court] to conclude that a rational trier of fact, after viewing the evidence in the light most favorable to the state, could have found that [Saxton] committed the essential element of [the crimes charged] beyond a reasonable doubt." *See Nash v. Eberlin*, 258 F. App'x 761, 765 (6th Cir. 2007).

When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis.  First, we must ask whether the evidence itself was sufficient to convict under *Jackson*.  The inquiry ends if we determine that there was sufficient evidence to convict Saxton.  If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could have found Saxton guilty beyond a reasonable doubt. *Id.*  The law therefore "commands deference at two levels." *Tucker*, 541 F.3d at 656.

### B.      Sufficiency of the evidence

#### *1.      The statutory language*

Saxton was convicted of aggravated murder, aggravated arson, and aggravated burglary. The relevant parts of the Ohio statute define aggravated murder as "purposely caus[ing] the death of

another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape." Ohio Rev. Code Ann. § 2903.01(B). Aggravated arson is defined as "by fire or explosion, . . . knowingly . . . [c]aus[ing] physical harm to any occupied structure." Ohio Rev. Code Ann. § 2909.02(A)(2). Finally, aggravated burglary is defined as "by force, stealth, or deception . . . trespass[ing] in an occupied structure . . . , when another person other than an accomplice of the offender is present, with purpose to commit in the structure . . . any criminal offense, if . . . [t]he offender inflicts, or attempts or threatens to inflict physical harm on another." Ohio Rev. Code Ann. § 2911.11(A)(1).

### 2.     *Summary of the evidence*

The following five categories of evidence were presented as proof of Saxton's guilt: (a) gasoline traces on either his shoes or denim shorts, or both; (b) the stolen bike with a blue cotton fiber on the seat; (c) inconsistent statements that he made to the police and to others regarding his whereabouts at the time of the murder; (d) statements about the murder that only the killer could have known; and (e) his quarrel with his wife over the use of her car, which allegedly constitutes evidence of motive. We will discuss each in turn.

#### (a)     *Gasoline traces*

When the police searched Saxton's residence, they found several articles of clothing soaking in the bathtub of the upstairs bathroom, including, among others, a pair of shoes and a pair of denim shorts. Officers testified that they smelled gasoline and a strong detergent coming from the bathtub. Results of lab testing revealed that traces of gasoline were present on either the shoes or the denim shorts. Which specific item contained the gasoline could not be determined because those articles were packaged together and were possibly cross-contaminated. However, there were no gasoline traces found on any of the other items of clothing in the bathtub, nor in the water sample that the police took from the tub. Saxton claimed that the clothing had been soaking in the tub since the night of July 4 or the early morning hours of July 5. But Stephanie Pittman, a friend of Saxton, testified that Saxton had worn the yellow shirt and the shoes found in the tub on July 6, the day before the murder.

The police also found that one of the shoes in the bathtub had a perfectly transferred impression of a magazine advertisement on its sole. After the police came across the magazine in Saxton's home, they determined that the issue did not arrive in Marion, Ohio until Tuesday, July 6. This further contradicted Saxton's statement that the clothes and the shoes had been in the bathtub since at least the early morning hours of July 5.

The state's expert witness testified at trial that Saxton probably had gasoline on the bottom of his shoe when he stepped onto the magazine. According to the expert, the gasoline acted as a solvent to dissolve the colors on the page and transfer a perfect imprint onto the sole of Saxton's shoe. The magazine itself, however, was not tested for gasoline because the state wanted to preserve the pages for other types of tests. A state-hired expert performed an out-of-court experiment with bond paper and gasoline that achieved a similar result. But Saxton's expert testified at trial that in his experiments with the sole of a tennis shoe, the colors of the magazine transferred when the bottom of the shoe was moistened only with water or even when it was dry.

The state's case was weakened by the fact that there was no gasoline found in either the water sample or in other pieces of clothing retrieved from the tub. The police, moreover, did not test for gasoline on either the pedals of the bike or the carpets in Saxton's house. During an interrogation by the police, Saxton claimed that he used gasoline borrowed from a neighbor to clean his hands after working at the county fair, and that some drops may have splashed on his clothes.

But this claim contradicted Saxton's earlier statement that no gasoline would be found on his clothes. The neighbor did not testify at the trial.

On the basis of this evidence and after drawing all inferences in favor of the state, a rational trier of fact could have concluded beyond a reasonable doubt that Saxton had been in recent contact with gasoline. The policemen who handled the clothing testified as to their actions. Their testimony, if believed, eliminates the possibility of contamination by the police as Saxton suggests. Saxton could not point to anything more than allegations of police misconduct to prove that his clothing was contaminated during the collection process, nor did he provide any corroboration for his alternative explanation of why gasoline was found on his clothing. A rational trier of fact could have therefore concluded that Saxton's unexplained traces of gasoline and his self-contradictory statements are evidence of aggravated arson.

### (b)    *The stolen bike*

Police and fire personnel testified that they noticed a single track in the grass at the crime scene, apparently left by a bicycle. The track led from the front of Braddy's house to the dirt alley behind the house. Later that day, a stolen bicycle was found abandoned four houses away from Saxton's residence. Plaster casts of tire tracks made in the alley running behind Braddy's house closely resembled the treads on one of the tires on the stolen bike and did not match any of the tires on approximately 125 bicycles that were in the custody of the Marion Police Department at the time of the murder. The bicycle was stolen approximately half-way between Saxton's residence and the crime scene. A blue fiber consistent with denim material was found on the seat of the bicycle. An eyewitness saw a black male riding a bicycle at 6:00 a.m. in the direction of Saxton's residence, but the witness could not identify Saxton and stated that the man had on long pants rather than denim shorts.

The state's theory was that Saxton had stolen the bike earlier in the evening, rode it to Braddy's house, killed her, set fire to the house, then rode the bike back to his own residence and abandoned it nearby. As Judge Bryant of the Ohio Court of Appeals pointed out in his dissent, however, numerous questions remain unanswered about this theory, including the tenuous connection between Saxton and the stolen bike. The only witness who saw someone riding a similar bike in the early morning of July 7 could not identify the rider and described a different outfit from that believed to be worn by Saxton. Moreover, the blue fiber found on the seat of the bicycle was simply "consistent with denim material," and the forensic scientist for the state could not narrow the source any more than this generalized description. On the basis of this evidence and after drawing all inferences favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that someone was riding a stolen bike on the morning of the fire and that someone who wore jeans had recently sat on the bike, but the trier of fact could not conclusively link Saxton to the stolen bike or place him at the crime scene based on this evidence alone.

### (c)    *Saxton's knowledge about the crime*

The state points to two statements made by Saxton that allegedly contained information that only the perpetrator himself would know. First, when the police arrested Saxton on the day of the fire for an unrelated parole violation, they informed him that they had recovered a bicycle a few doors from his residence, but did not tell him the exact location where the recovery was made. Saxton then called his home phone and spoke with Stephanie Pittman. He asked Pittman to look behind the residence and to the left to see if she could see a bicycle along the side of the fence. The state argues that Saxton would have known where the bicycle was only if he had been the thief. Judge Bryant, however, pointed out that Saxton's residence is on the corner of a block and there would have been only one logical direction in which to look for the bicycle.

Second, before the police had released the details about the arson and the murder, Saxton told Kimberly Keith, another friend of his, that Braddy had been strangled. The state contends that only the killer would have known that Braddy died of strangulation because Braddy's cause of death had not been publicized at that point. Saxton, however, claims that Walter Eugene Thieshen, his jail mate, had told him about Braddy's cause of death and other details concerning the arson. Thieshen testified that he had learned these details from the police radio traffic while in a squad car with Detective Jeff Shenefield, where the latter had asked him what the "word on the street" was regarding the crime. Detective Shenefield acknowledged asking Thieshen about "the word on the street," but denied that Thieshen could have learned about the cause of death from the police radio traffic.

Although Saxton's knowledge of where the stolen bicycle was located is inconclusive and he presented an innocent explanation for his knowledge of Braddy's cause of death, the jury was entitled to believe Detective Shenefield's testimony over that of Thieshen. The trier of fact could thus have reasonably concluded that Saxton's knowledge regarding the cause of death is evidence of his guilt for aggravated arson and aggravated murder.

### (d)     Saxton's conflicting accounts of his whereabouts

Saxton presented numerous conflicting accounts of his whereabouts during the critical period between 3:00 a.m. and 6:00 a.m. on the morning of the fire. That morning, Saxton's mother was moving from Cleveland to live with him in Marion. Saxton initially told the police that his mother arrived in Marion shortly before 3:00 a.m. Detective Shenefield testified that when he interviewed Saxton on the morning of the fire, Saxton told him that he had gone to bed between 2:00 a.m. and 2:30 a.m, then stayed up and talked to his mother all night after she arrived. Saxton changed his story during an interview with the police five days later and refused to give specific answers regarding when his mother came into his house that morning, except to tell officers that he "missed connections" with his mother. During the same interview, he told the police that he had gone outside to make a long-distance call at a pay phone to his ex-girlfriend.

Saxton's wife Pam testified that Saxton told her that when his mother arrived before dawn on July 7, he did not let her in right away because he had a female in the house. She also said that Saxton had told her previously that he did not let his mother in until 6:00 a.m., but later told her that he had let his mother in at 4:00 a.m. Pittman, with whom Saxton spoke after the fire, stated that Saxton told her that he was standing outside around 3:45 a.m. Finally, Saxton told Keith on July 9 that he had picked up his mother in Cleveland and driven her back to Marion in a U-Haul truck, and that upon arriving in Marion "in the wee hours of the morning," his mother had spent the entire night outside in the truck. Keith testified that Saxton never explained to her why his mother did not come into the house. Saxton's mother never testified.

Based on these conflicting stories, the jury could have determined that Saxton was not credible. It could have concluded beyond a reasonable doubt that these inconsistent statements regarding Saxton's whereabouts on the morning of the fire indicate that he had something to hide, and could have then chosen to disregard all of Saxton's exculpatory explanations as untrustworthy.

### (e)     Saxton's argument with Pam

According to the state's theory of the crime, Saxton went to Braddy's house to look for the keys to Pam's car and, when he could not find the keys, he strangled Braddy in a rage and set the house on fire to destroy the evidence. Pam testified that on July 3, four days before the fire, she had a heated argument with Saxton when she refused to let him drive the car while she was visiting family members. Saxton told her that he would "blow that bitch up" (referring to the car) and that he would "go down there and set that car and the house on fire." Pam further testified that Saxton

knew that she was leaving the car at her mother's house, and that she had never seen him so angry. Based on this evidence and drawing all inferences in favor of the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that Saxton was enraged by Pam's refusal to let him drive her car, thus providing a motive for him to go to Braddy's residence in an attempt to retrieve the keys.

### 3.      *Sufficiency of the evidence*

A conviction may be sustained based upon nothing more than circumstantial evidence. *See United States v. Kelley,* 461 F.3d 817, 825 (6th Cir. 2006) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."). Although the evidence presented by the state at trial was all circumstantial and admittedly not conclusive, a rational trier of fact could have found that Saxton was extremely angry because he had been denied the use of Pam's car, that he knew the car was at Braddy's house, that he had the motive to go to the house in an attempt to locate the car keys, that he possessed information about the killing that only the perpetrator himself would know, that he was in recent contact with gasoline, and that he could not produce a credible account of his whereabouts during the morning of the fire. This was sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that Saxton strangled Braddy and then used gasoline to set her body and the house on fire in an attempt to destroy the evidence. The jury thus had a rational basis to find him guilty of aggravated arson and aggravated murder.

In addition, the charge of aggravated burglary was proven by sufficient evidence. "The *Jackson* standard is to be applied with explicit reference to the criminal offense as defined by state law." *York v. Tate*, 858 F.2d 322, 327 (6th. Cir. 1988) (internal quotation marks omitted). To prove aggravated burglary, the state needed to show that Saxton (1) was trespassing (2) in an occupied structure (3) with the intent to commit a criminal offense and that he (4) inflicted physical harm on another. Ohio Rev. Code Ann. § 2911.11 (A)(1). The prosecution points out that even if Braddy admitted Saxton into her home, any privilege to be on the premises ended when Saxton strangled her. At that point, Saxton was trespassing in Braddy's residence. *See State v. Steffen*, 509 N.E.2d 383, 388-89 (Ohio 1987) ("[E]ven assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in [the victim's] home terminated the moment he commenced his assault on her."). Elements (1) and (2) of an aggravated burglary charge are therefore satisfied. Element (4) is also satisfied when the jury found Saxton guilty of aggravated murder.

Element (3) presents a closer question. The state established that Saxton was angry about Pam's refusal to let him use her car and that he had threatened to blow up both the car and the house. This evidence by itself does not necessarily show that Saxton went to Braddy's residence on the night of the fire in order to commit theft, defined under Ohio law as "with purpose to deprive the owner of property or services, . . . knowingly obtain[ing] or exert[ing] control over . . . the property . . . without the consent of the owner . . . ." Ohio Rev. Code Ann. § 2913.02(A)(1). Nonetheless, given that the *Jackson* standard asks whether, after drawing all inferences in favor of the prosecution, any rational trier of fact could have concluded that Saxton had formulated a motive to commit theft, we cannot say that a rational trier of fact could not so conclude on the basis of the circumstantial evidence presented.

### 4.      *AEDPA standards*

Even if we were to conclude, after reviewing the record and drawing all inferences in favor of the prosecution, that Saxton's convictions were not supported by sufficient evidence, the question would remain whether the Ohio Court of Appeals was unreasonable in concluding otherwise. "State court findings of fact are to be presumed correct unless the petitioner rebuts the presumption

with clear and convincing evidence." *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002). A federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the state-court decision applied a Supreme Court case incorrectly." *Price v. Vincent*, 538 U.S. 634, 641 (2003) (internal brackets omitted). It must further conclude that the state-court decision was objectively unreasonable. *Williams v. Taylor*, 529 U.S. 362, 409 (2000). Given that even the dissenting judge on the Ohio Court of Appeals agreed that Saxton's convictions were supported by sufficient evidence, we find no basis to conclude that the state court's decision failed to pass muster under AEDPA.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.