NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0482n.06

No. 15-3666

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 17, 2016
DEBORAH S. HUNT, Clerk

THOMAS C. DIBIASE,

    Petitioner-Appellant,

v.

LASHANN EPPINGER, Warden,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

BEFORE: SUTTON, GRIFFIN, and DONALD, Circuit Judges.

GRIFFIN, Circuit Judge.

After Dale McNaughton pleaded guilty to committing several burglaries in the Cleveland area, the State of Ohio turned its attention to his suspected accomplice—petitioner Thomas DiBiase. The state charged DiBiase with three counts of burglary and receiving stolen property, as well as two counts of engaging in a pattern of corrupt activity. Its case was based solely on circumstantial evidence: cell phone records, eyewitness testimony, and stolen property found in his home. The jury convicted petitioner of two of the three burglaries. Thereafter, the Ohio Court of Appeals affirmed his convictions, *State v. DiBiase*, No. 2011-L-124, 2012 WL 6727335 (Ohio Ct. App. 2012), and the Ohio Supreme Court denied discretionary review, *State v. DiBiase*, 986 N.E.2d 31 (Ohio 2013).

DiBiase now seeks habeas relief, claiming that the state court unreasonably applied the sufficiency-of-the-evidence standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979). The district court denied the petition. We affirm.

I.

In February and March 2010, the Cleveland area experienced a string of burglaries that followed a similar modus operandi. The M.O. was not particularly innovative. The burglar would canvas neighborhoods for unoccupied homes under the auspices of soliciting signatures for a voter initiative. When he found a suitable unoccupied house, he would force his way inside, ransack the home for valuables, and fence the stolen items at nearby pawn shops and precious metals dealers.

This continued for several weeks until the police learned the name of the suspected burglar: Dale McNaughton. He was the prime suspect in at least ten burglaries in the area. For three of them, police believed that he was assisted by petitioner Tom DiBiase. The Ohio Court of Appeals recounted the facts of each burglary as follows:

### The Ritchey Burglary

{¶ 4} In February 2010, John Vaughan was watching over the Willoughby Hills home of his friend Stephan Ritchey. Mr. Ritchey and his wife own another home in Utah, and were residing there during the month of February. Mr. Vaughan checked on the home in mid to late February and found the Ritchey home had been burglarized. The back door had been kicked in, and items including a flat-screen television had been taken. Mr. Vaughan called the police immediately and placed a report. Officer Neath of the Willoughby Hills Police Department responded to the call, spoke to Mr. Vaughan, and collected evidence. No fingerprints, blood, or other physical evidence were recovered from the Ritchey house. During the course of his immediate investigation, Officer Neath was informed that a large brown vehicle had been seen in the area that day.

{¶ 5} Mr. Ritchey arrived home a few days after the burglary was discovered to take stock of the home and survey the damage. He indicated that the items stolen

included the flat-screen television, jewelry and jewelry boxes, and cash; he and his wife estimated the value of the stolen items at $5,900.

{¶ 6} A few weeks later, Mr. and Mrs. Ritchey located one of their missing items at George's Pawn Shop in Euclid. The receipt for the item indicated that it had been sold to the shop by a man named Dale McNaughton.

### *The Stewart Burglary*

{¶ 7} On March 2, 2010, Sandra Stewart returned home from work to find that her home, located in Mentor, had been burglarized. Various items, including jewelry, jewelry boxes, personal records, and collectible coins, had been taken from her home. She estimated the value of the items taken at close to $10,000. It appeared that the burglar had gained entry via a side door leading to the laundry room, but a window in the family room had also been broken. She later discovered that there was also damage to her sliding glass door.

{¶ 8} Mrs. Stewart alerted authorities, who began an investigation. The police, among other efforts to collect evidence, took molds of the damage to the window and sliding glass door, as well as foot prints found in the snow outside. They eventually connected the damage to the door and window to a blue pry tool recovered from a silver Buick driven by a young man named Sergio Reynolds, Mr. DiBiase's son, and the foot prints to shoes owned by Mr. DiBiase's friend Dale McNaughton.

{¶ 9} During the course of their investigation, Mentor Police were provided useful information from Bonivere Stewart and Patricia Wigand. Bonivere Stewart, Mrs. Stewart's mother-in-law and across-the-street neighbor, told police that a young man had knocked on her door around 1:30 p.m. on March 2, 2010. She answered the door and found a college-aged man asking her to sign a petition against casinos in Ohio. He held a spiral bound notebook with the words "No Casinos in Ohio" handwritten on the front cover. Bonivere Stewart declined to sign the petition, and then observed the young man walk through her yard and on to the next house. She later identified this individual as Dale McNaughton.

{¶ 10} Patricia Wigand, a neighbor of the Stewarts, told police that she had observed some concerning activity on the afternoon of March 2, 2010. Ms. Wigand observed a man wearing a hoodie walk down the Stewarts' driveway and across the street carrying a plastic bag containing something. She watched the man cross the street, sit in the snow, and place a call on a cell phone. A few minutes later, Ms. Wigand observed a silver or grey Buick pick up the hoodie-

clad man. She did not see the person driving the car, as he did not exit the vehicle. Ms. Wigand also stated to police that, earlier in the day, she had observed a different, darker colored vehicle driving up and down the street.

{¶ 11} Mrs. Stewart and her husband were able to recover some of the missing jewelry from Great Lakes Coin and Jewelry, a precious metals dealer in Willoughby. They were informed by Great Lakes Coin and Jewelry that Dale McNaughton had sold the jewelry to the store.

### *The Ivancic Burglary*

{¶ 12} On March 12, 2010, Eileen Ivancic learned that her home in Willoughby Hills had been burglarized. A police officer had been called to the area to investigate suspicious activity and found the Ivancic's front door kicked in. Mrs. Ivancic and her husband were in Florida at the time; they returned home to evaluate the damage and determine what had been taken from them. The Ivancics identified that the items stolen included jewelry, coins, cash, and a black Luger handgun. They estimated the value of the stolen items to be between $25,000 and $30,000.

{¶ 13} The police took evidence from the Ivancic's home, including a lift of a large shoe print found on the front door of the house. The shoe print was submitted to the Lake County Crime Lab.

{¶ 14} Willoughby Hills Police were informed by Denise Penza, a resident of Kirtland, that she had observed a suspicious young male hiding behind a guardrail on March 12, 2010, at approximately 8:00 p.m. The young man was carrying a white sack that appeared to be full. She observed him get into a vehicle driven by someone else, but was unable to describe the vehicle.

*DiBiase*, 2012 WL 6727335, at **1–3.

Police caught a break in the case on March 17, when a local precious metals dealer, Michael Ponsart, identified Dale McNaughton as the seller of several pieces of stolen jewelry. He told police that McNaughton would usually come with DiBiase, describing the two as a "team." Ponsart testified that petitioner visited his store "quite a few" times with McNaughton. A "handful" of times DiBiase sold items; other times, he simply accompanied McNaughton. He

explained that "DiBiase usually drove" and that "there was always a silver Buick that they would come in."

Police also spoke with an employee at another local precious metals shop, Michelle Flaisman. She remembered DiBiase visiting her store about five or six times, trying to sell coins and jewelry. On March 3, the day after the Stewart burglary, DiBiase sold roughly $430 worth of jewelry. She testified that DiBiase would sometimes come with McNaughton, who he told Flaisman was his son.

On March 19, four days after DiBiase began serving an unrelated jail sentence, McNaughton visited Ponsart's shop in the silver Buick. Ponsart contacted the police, who arrived in time to obtain the vehicle's license plate number. The next day, police stopped the vehicle. Inside were Sergio Reynolds, DiBiase's son, and Val Bencivenni, Sergio's friend. Police also recovered McNaughton's driver's license, a blue pry bar, which police later matched to the forced-entry marks at the Stewarts' home, a spiral notebook with "anti-abortion" written atop one of the pages, and a small bag of jewelry.

Police executed search warrants for McNaughton's and DiBiase's homes, which were down the street from each other. Police recovered some of the Stewarts' stolen jewelry at both homes. They also found some of the Ivancics' property at DiBiase's home.

Patricia Hale, McNaughton's fiancée, spoke with DiBiase on the phone in the wake of the search warrant execution. Speaking "in code," Hale asked about the location of "the black guy," referencing a gun that McNaughton had hidden at DiBiase's house. During another call, DiBiase instructed Hale to tell McNaughton to keep quiet and not to talk to the police, warning her that "loose lips sink ships." At trial, she testified that DiBiase would pick McNaughton up "every day" during February and March 2010 and that he drove a silver, four-door car.

Police also obtained McNaughton's and DiBiase's cell phone records. To assist the jury in understanding the records, the state presented testimony from an expert, Detective Juanita Vetter. According to Vetter, cell phones operate by sending a signal to the nearest cell phone tower, which then relays the signal to the tower nearest to the receiving phone, which in turn relays the call to that phone. Although calls are normally routed through the nearest tower, if that tower is at full capacity, the signal will be sent to the next closest tower. Cell phone towers in the Cleveland area have a typical range of three to five miles. Because McNaughton and DiBiase had the same service provider, and in fact were on a shared plan, the records captured the tower information for each outgoing and incoming call made between the two.

Cell phone records from March 2, the day of the Stewart burglary, showed that McNaughton called DiBiase on his home phone at 10:02 and 10:30 a.m. McNaughton's end of the call routed through the Lakeshore tower, which covers his and DiBiase's homes. Then, "shortly after 1 o'clock," McNaughton called DiBiase on his cell phone, and each phone was routed through the Reynolds tower, which covers the area of the Stewart residence. Over the next twenty-seven minutes, McNaughton placed three short calls to DiBiase, all of which continued to route through the Reynolds tower. Shortly after that, McNaughton called an unknown number and his call routed through the St. Clair Street tower; forty minutes after that, he made another call that routed through the Lakeshore tower. DiBiase made no calls during this time.

Regarding the day of the Ivancic burglary, the March 12 cell phone records established that McNaughton and DiBiase called each other throughout the day, each time routing through the Lakeshore tower. Then, at 7:59 p.m., McNaughton called DiBiase. McNaughton's end of the call routed through the Kirtland tower and DiBiase's end routed through the nearby Par Lane

tower—both of which covered the Ivancics' residence. Two minutes later, McNaughton called DiBiase again. This call, like the first, was short in duration. McNaughton's end routed through both the Par Lane and Kirtland towers, and DiBiase's end again routed through the Par Lane tower.

Based on this evidence, the state issued an eight-count indictment against DiBiase. Counts one and two charged him with burglary and receiving and concealing stolen property of the Ritcheys in February 2010. Counts three and four charged petitioner with the same offenses for the Stewart burglary on March 2, and counts five and six did the same for the Ivancic burglary on March 12. Count five included a firearm specification for the alleged possession of a firearm during the burglary (the Luger that was taken during the Ivancic burglary). Counts seven and eight charged DiBiase with engaging in a pattern of corrupt activity (Ohio's RICO analogue) relating to the series of charged burglary and receiving stolen property offenses.

The case proceeded to trial, at which the facts recited above were presented to the jury. The jury acquitted DiBiase of counts one and two (the Ritchey burglary), but found him guilty of counts three through eight (the Stewart and Ivancic burglaries).

In his habeas petition, DiBiase raised two grounds for relief. In Ground One, DiBiase alleged that "[he] was denied due process of law under the Fourteenth Amendment to the United States Constitution when his conviction was not supported by sufficient evidence." In Ground Two, petitioner alleged ineffective assistance of trial and appellate counsel.[1] The Warden filed a return, contesting DiBiase's first ground for relief as "nothing more than a disagreement with the credibility determinations of the jury" and therefore "void of merit."

---

[1]DiBiase did not object to the magistrate's recommendation that relief be denied on this ground, and he does not try to resurrect this claim on appeal. We therefore do not discuss it further.

The magistrate judge issued a report and recommendation (R&R). She concluded that petitioner was not entitled to relief on his convictions for engaging in a pattern of corrupt behavior (counts seven and eight) or for receiving stolen property (counts four and six). However, with respect to the burglary convictions, the magistrate judge concluded that "th[e] jury made some impermissible inferences and assumed facts not in evidence, thereby failing to arrive at a plausible verdict on Counts 3 [and 5]." According to the magistrate judge, the only evidence connecting DiBiase to the burglaries was expert testimony that his cell phone routed through the tower nearest to the Stewart residence. There was no other physical evidence inculpating DiBiase. Therefore, the magistrate judge recommended that the district court grant habeas relief with respect to counts three and five, but deny relief in all other respects.

The Warden filed objections to the R&R, but petitioner did not. The Warden argued that the magistrate judge failed to administer the double dose of deference afforded to state courts in assessing sufficiency of the evidence claims and, in fact, failed to acknowledge the Ohio Court of Appeals opinion at all. DiBiase filed a response, countering that the magistrate cited and applied the correct, deferential standard.

The district court issued an opinion and order sustaining the Warden's objections and denying habeas relief in all respects. The district court agreed that "the magistrate judge failed to properly pay deference to the state court judgment." After reciting the evidence presented at trial and the state court's analysis of DiBiase's claim, the court determined that the "record evidence amply supports both of Mr. DiBiase's burglary convictions" and that "the state court's sufficiency determination was not unreasonable." However, it recognized that "reasonable jurists could find it debatable whether the petition presents a valid claim that the evidence was insufficient to support Mr. DiBiase's convictions for burglary and burglary with a firearms

specification" and granted a certificate of appealability "as to that claim only." It concluded that there was no basis to grant a COA on the remaining issues.

DiBiase filed a notice of appeal, which we construed as an application for an expanded COA. *DiBiase v. Eppinger*, No. 15-3666 (6th Cir. Nov. 17, 2015) (order) at 1. This court declined to expand the COA to include sufficiency-of-the-evidence claims relating to his convictions for engaging in a pattern of corrupt activity and for receiving stolen property, as well as his ineffective assistance of counsel claim. *Id.* at 3–4. In the same order, we granted DiBiase's request for appointed counsel, *id.*, who ably represented Mr. DiBiase before this court.

II.

DiBiase's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Under AEDPA, a federal court may grant habeas relief to a state prisoner, like DiBiase, only if he establishes that the state court's "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

Petitions for habeas relief based on insufficient evidence are reviewed under the "unreasonable application" prong of § 2254(d)(1). *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). Under this standard, it is not enough that the state court decision was "erroneous[] or incorrect[]." *Renico v. Lett*, 559 U.S. 766, 773 (2010). Rather, a petitioner must establish that it was "objectively unreasonable." *Id.* This requires a showing that the state court's handling of the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). AEDPA "imposes a highly deferential standard for

evaluating state-court rulings," *Renico*, 559 U.S. at 773, and, consequently, a "substantially higher threshold" for those seeking to set them aside, *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). That threshold is highest when the legal standard at issue is "general" in nature, since there is "greater . . . potential for reasoned disagreement among fair-minded judges." *Renico*, 559 U.S. at 776. The constitutional standard for sufficient evidence—once described by this court as "exceedingly general," *Davis v. Lafler*, 658 F.3d 525, 535 (6th Cir. 2011) (en banc)—fits that description. Therefore, petitioner bears a heavy burden in seeking to set aside the Ohio Court of Appeals decision.

The "clearly established law" at issue is the constitutional standard for sufficient evidence established in *Jackson v. Virginia*, 443 U.S. 307 (1979). Under *Jackson*, evidence is sufficient to support a guilty verdict if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. We apply this standard by "reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16. The criminal offense in this case is Ohio's burglary offense, Ohio Rev. Code § 2911.12(A)(2). DiBiase was tried under Ohio's complicity statute, Ohio Rev. Code § 2923.03, which provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet another in committing the offense[.]" *Id.* § 2923.03(A)(2). Here, "the kind of culpability required for the commission of [the burglary] offense" is "the purpose to commit . . . a theft offense . . . or any felony" while inside the structure. *See State v. Wilson*, 388 N.E.2d 745, 749 (Ohio 1979); Ohio Rev. Code § 2911.12(A)(2). In other words, the state had to prove that DiBiase assisted McNaughton with the intent that he commit a theft in the Stewarts' and Ivancics' homes.

When reviewing whether the state court's sufficiency-of-the-evidence determination was "objectively unreasonable," we use a two-step approach. *Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010). First, we ask whether the evidence itself was sufficient to convict under *Jackson. Id.* If so, the inquiry ends. If, however, this court concludes that the evidence was insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find the petitioner guilty beyond a reasonable doubt. *Id.*

A.

We begin with the Stewart burglary. Viewed in the light most favorable to the prosecution, the evidence at trial showed that: McNaughton committed the Stewart burglary, according to McNaughton himself; on the afternoon of the Stewart burglary, McNaughton was picked up from the Stewart residence by someone driving a silver Buick shortly after calling someone on the phone, according to Patricia Wigand; McNaughton called DiBiase several times during that same period and each's phone routed through the same tower covering the Stewart residence, according to Detective Vetter; DiBiase drove a silver, four-door Buick, according to Hale and Ponsart; and police recovered several pieces of the Stewarts' jewelry at DiBiase's home, according to Detective James Collier.

Petitioner argues that this was all circumstantial evidence. However, circumstantial evidence is sufficient to establish all the elements of an offense, including proof of criminal intent, the element DiBiase challenges most strenuously. *See State v. Haller*, 982 N.E.2d 111, 117 (Ohio Ct. App. 2012) ("[T]he defendant's criminal intent may be inferred from his or her presence, companionship, and conduct before and after the offense is committed."). McNaughton, whom the jury knew committed the Stewart burglary, called DiBiase several times

in succession during the suspected period of the burglary. Faced with these two facts—McNaughton's role and his brief, successive communications with DiBiase—a rational juror could infer that McNaughton's calls to DiBiase were not social in nature, but in furtherance of the burglaries he was committing. Moreover, DiBiase was in the same area as McNaughton when he made the calls. Although circumstantial, the totality of the evidence leads to a reasonable inference that DiBiase was McNaughton's knowing accomplice in the Stewart burglary.

The evidence with respect to the Ivancic burglary is also sufficient. Again, viewed most favorably to the prosecution, the evidence established that: McNaughton committed the Ivancic burglary, according to McNaughton himself; at 8:00 p.m. on the evening of the Ivancic burglary, McNaughton called DiBiase twice, and each time their calls routed through the towers covering the Ivancic residence, according to Detective Vetter; at the same time, McNaughton was seen waiting to be picked up near the Ivancic residence, according to Denise Penza; and police recovered the Ivancics' stolen property at DiBiase's home, according to Sergeant Jamie Tavano. Furthermore, we recognize that the jury did not assess this evidence in a vacuum. After reviewing the evidence relating to the Stewart burglary, the jury was convinced beyond a reasonable doubt that DiBiase was McNaughton's accomplice for that offense. Add to that premise the fact that the Ivancic evidence followed a similar modus operandi, and it was rational for the jury to infer that DiBiase played the same role in the Ivancic burglary.

Other features of the state's case against DiBiase buttressed these conclusions. First, the cell phone records also show that each was at home at the same time on the days of the burglaries, but then simultaneously traveled to the same geographic area as the burglaries. Because it was undisputed that one of these two men committed the burglaries, it was rational for

the jury to conclude that his "team"-member, who happened to travel to the same area, assisted him in the burglaries. Second, McNaughton fenced the stolen items at various pawn and precious metals shops shortly after each heist, and DiBiase usually drove him there. Flaisman also testified that DiBiase sold jewelry the day after the Stewart burglary, and visited four or five other times during that period. DiBiase's continued assistance in fencing the stolen items further reinforces the inference that DiBiase intended to aid McNaughton in committing theft offenses. *See Haller*, 982 N.E.2d at 122 (evidence of acting as get-away driver and selling stolen items supported convictions for burglary as an accomplice). And third, in recorded jail calls played to the jury, DiBiase made statements that either contradicted the other evidence or other statements he made, including the existence of a firearm at his home (*compare* Appendix, A9 ("I never had the black guy over there."), *with* Appendix, A10 ("Oh, [the fake old black guy.] . . . Yeah I don't, you know.")); the number of times he accompanied McNaughton on trips relating to the burglaries (*compare* ID 1070–71 (Ponsart describing the numerous times DiBiase visited his shop with McNaughton), *with* Appendix, A8 ("[I rode] Dale once, you know what I mean. [To a] store to get shoes, that was it.")); and whether he was involved in the burglary scheme at all (*compare* Appendix, A21 ("I didn't do nothing. I know that for sure."), *with* Appendix, A63–64 ("[T]hey [the police] better realize, I don't shit in my own backyard.")).

By the time the state rested its case, the jury knew that McNaughton committed both crimes; that DiBiase spoke with McNaughton during or shortly after the burglaries; that he was close by and even picked McNaughton up; that he transported McNaughton to pawn shops and precious metals dealers; and that he had the victims' stolen property at his home. The jury was entitled to credit each piece of evidence, and *Jackson* prohibits a reviewing court from second-guessing its assessment. 443 U.S. at 319. Indulging the reasonable inferences in favor of the

jury's verdict, we conclude this evidence was sufficient for a rational juror to rule that DiBiase

assisted McNaughton with the intent that McNaughton commit theft offenses inside the Stewart

and Ivancic residences.

B.

The Ohio Court of Appeals came to the same conclusion, and, under AEDPA, its

determination is entitled to "deference and latitude." *Harrington*, 562 U.S. at 101. In its

decision, the state court of appeals addressed DiBiase's claim as follows:

> {¶ 41} The evidence presented by the state at trial painted a picture in which Mr. DiBiase purposefully assisted Mr. McNaughton and Mr. Reynolds in the commission of the burglaries by being present in the area during the times the homes were broken into, providing logistical support via the telephone, and picking up the assailant upon leaving the homes with stolen property. Further, Mr. DiBiase accompanied Mr. McNaughton to various pawn shops and precious metal[s] dealers the day after the commission of each of the three burglaries in this case, selling items for cash. Some of those items were identified by their true owners as stolen from their homes. Further, Mr. DiBiase's silver Buick was regularly seen in the vicinity of the burglaries the day of the break-ins. Lastly, some of Ms. Stewart's jewelry was recovered from Mr. DiBiase's bedroom upon execution of the search warrant, further tying him to these crimes. Couple this with the phone conversations he had with Mr. Reynolds and Ms. Hale, which suggested his knowledge and ultimate complicity in the burglaries, it is impossible to say the jury lost its way in finding Mr. DiBiase guilty.

> {¶ 42} We further find it noteworthy that the jury did not convict Mr. DiBiase of counts one and two of the indictment. This outcome suggests that the jury took its job seriously and engaged in an appropriate weighing of the evidence. It is clear that the jury found the evidence supporting counts three through eight much more compelling, and thus convicted him on those six counts.

> {¶ 43} A review of the record demonstrates that the state submitted substantial evidence as to the six counts Mr. DiBiase was convicted of, and the jury did not lose its way in delivering a guilty verdict. The assignment of error is without merit and the judgment of the Lake County Court of Common Pleas is affirmed.

*DiBiase*, 2012 WL 6727335, at **7–8.

On habeas review, AEDPA requires DiBiase to establish that this analysis and conclusion "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

DiBiase raises a variety of arguments challenging the reasonableness of the court of appeals decision, but they all suffer from a common, fatal flaw: they fail to take into account the deference owed to the jury and the state appellate court that reviewed its verdict. DiBiase stresses that "[m]ere association with the principal is not enough," *State v. Sims*, 460 N.E.2d 672, 675 (Ohio Ct. App. 1983), and that the Ohio Court of Appeals affirmed his conviction based on nothing more than "[v]ague proximity to the scene of the crime and association with the culprit." However, the evidence—viewed in the light most favorable to the prosecution—shows much more than simply associating with McNaughton or merely being present at the scene. He drove McNaughton to the precious metals shops on multiple occasions, and he had several pieces of the victims' jewelry. DiBiase also fielded several calls from the burglar during the suspected time of the burglary and was in the same area as the burglary, leading to the (not unreasonable) inference that DiBiase provided transportation and logistical services. *See DiBiase*, 2012 WL 6727335, at *7.

Next, DiBiase challenges this last genre of evidence, arguing that the cell phone tower records do not establish his presence at the scene, only within three to five miles of the cell tower in question. Viewed in the prosecution's favor, however, the cell phone evidence shows that both DiBiase and McNaughton were at their respective homes before each burglary, and that they each left and traveled to the same area at the same time. Couple that with the fact that the jury knew McNaughton was at each residence, and it was reasonable to infer that DiBiase was as well. Regardless, the state did not need the cell phone records to place DiBiase at the scene. It

had two eyewitnesses who observed someone pick up McNaughton, and one of the eyewitnesses' description of the vehicle matched DiBiase's.

Petitioner parries that the state never proved that he owned the silver Buick. However, police observed the silver Buick in DiBiase's driveway, Ponsart stated that DiBiase drove a grey or silver Buick, and Hale testified that DiBiase drove a silver four-door vehicle. Viewed in the prosecution's favor, this evidence shows DiBiase had dominion over the silver Buick during the period in question.

Also, he contends that, even assuming he was McNaughton's driver on the night of the Ivancic burglary, the state court "failed to note any evidence to exclude the possibility that Dale simply asked Tom for a ride, without mentioning his involvement in a burglary." But that asks too much of the state court of appeals. The question for the state court was not whether the prosecution "rule[d] out every hypothesis except that of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 326. The question was whether any rational juror could conclude that DiBiase assisted McNaughton with the intent that McNaughton burgle the Ivancics' home. The pattern of calls supported an inference that DiBiase was providing nearby logistical support, and the evidence of DiBiase's knowing assistance in the Stewart burglary ten days earlier supported the inference that DiBiase knew McNaughton intended to burgle the Ivancics.

Next, DiBiase argues that the state failed to present any evidence that he was with McNaughton at the precious metals shop when McNaughton sold the victims' stolen items. However, Ponsart kept a log of DiBiase's and McNaughton's visits and testified about the dates that each sold items. He estimated that DiBiase accompanied McNaughton at least 75 to 80 percent of the time McNaughton sold items. He also said that "[DiBiase] very well could have been [with McNaughton], because he was most often there with him." Accepting this testimony

as true, it was reasonable for the jury to conclude that, of the 75 to 80 percent of the time that DiBiase was with McNaughton, McNaughton sold stolen items.

Petitioner also asserts that the Ohio Court of Appeals improperly relied on the fact that he advised McNaughton and others to stay quiet and not talk with police. He contends that he was merely conveying sound legal advice. That, of course, is one way to interpret DiBiase's statements. However, another reasonable interpretation of DiBiase's advice that "loose lips sink ships" is that DiBiase was a crewmember of that "ship" and that he did not want others to scuttle the enterprise of which he was a part.

Finally, that the jury acquitted DiBiase of the Ritchey burglary does not mean it lost its way in finding him guilty of the Stewart and Ivancic heists, as petitioner contends. In fact, there appears to be a rational explanation. At trial, Detective Vetter testified that McNaughton made several calls to DiBiase on the day of the Ritchey burglary. She initially testified that McNaughton's calls routed through the Kirtland tower. However, later in her testimony, she identified another tower—the Par Lane tower—as covering the Ritchey residence and as the one through which McNaughton's calls were routed. The jury presumably picked up on this inconsistency in the state's proofs. Add to that the fact that McNaughton never confessed to the Ritchey burglary, and the jury had a legitimate basis to reasonably doubt defendant's guilt as an accomplice.

In the final analysis, *Jackson* and AEDPA require us to give deference to both the trier of fact and reviewing state court. None of DiBiase's arguments pierce this double layer of deference. Viewing the evidence in the light most favorable to the prosecution, a rational juror could conclude that DiBiase assisted McNaughton with the intent that McNaughton commit theft offenses inside the Stewart and Ivancic residences. What's more, such a conclusion is not "so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Accordingly, DiBiase is not entitled to habeas relief with respect to his burglary convictions.

C.

Petitioner makes several other arguments in support of his petition for habeas relief. None have merit.

DiBiase contends that the state failed to present sufficient evidence regarding the firearm specification in count five. He argues that, "'[w]ithout knowing of the existence' of the weapon, Tom 'could not possibly share the culpability required' for the firearm enhancement.'" Appellant Br., p. 35 (quoting *State v. Frymire*, No. CA2014-02-034, 2015 WL 240483, at *3 (Ohio Ct. App. 2015)). We are not persuaded. Ohio's firearm specification does not require "a culpable mental state," *State v. Cook*, No. 24058, 2008 WL 4335675, at *2 (Ohio Ct. App. 2008), but rather imposes strict liability, *State v. Gilbert*, No. 90615, 2009 WL 270522, at *4 (Ohio Ct. App. 2009). For that reason, the Ohio Court of Appeals has previously rejected the precise argument DiBiase makes here, *i.e.*, that the state must prove an accomplice knew the principal possessed a firearm in order to impose the specification:

> Contrary to [the defendant]'s argument, however, once the state proved that [the defendant] was complicit in the commission of the underlying offenses, the state did not then also need to separately prove [the defendant]'s complicity as to the associated firearm specifications, i.e., that [the defendant] "specifically aided and abetted [the principal] in brandishing, possessing or using the firearm at the time of the shooting incident."

*State v. Capp*, No. 102919, 2016 WL 541444, at *7 (Ohio Ct. App. 2016) (citing *State v. Moore*, 990 N.E.2d 625, 638 (Ohio Ct. App. 2013) ("[A]n unarmed person can be sentenced for a firearm specification if they were only complicit in committing the offense to which the

specification attached.")). Because the firearm specification statute imposes no mens rea requirement, there is no culpability that DiBiase was required to share with McNaughton for purposes of the complicity statute. DiBiase's key case, *Frymire*, is distinguishable on this basis. *Frymire* involved the substantive offenses of aggravated burglary and aggravated robbery, and it is clear from *Frymire* that Ohio imposes a mens rea requirement for the firearm possession element of those offenses. 2015 WL 240483, at **2–3. But it is equally clear that Ohio's firearm specification statute imposes no mens rea requirement. *See Cook*, 2008 WL 4335675, at *2. Therefore, unlike in *Frymire*, the state was not required to prove that DiBiase knew McNaughton intended to possess a firearm during the Ivancic burglary.

DiBiase also raises insufficient-evidence claims regarding count six (receiving stolen property of the Ivancics), and counts seven and eight (engaging in a pattern of corrupt activity). However, this court previously denied DiBiase's request to expand the certificate of appealability to include these issues. *DiBiase*, No. 15-3666 at 4. This panel is therefore without authority to address these claims. *See Hill v. Mitchell*, 400 F.3d 308, 329 (6th Cir. 2005) (stating that "Congress has not given us authority to address [a] claim" not specified in the certificate of appealability); 28 U.S.C. § 2253(c)(1)(A) ("Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .").

DiBiase argues that we may nonetheless consider the claims *sua sponte* because the original order denying the request to expand the COA was merely interlocutory in nature and therefore "subject to revision." *See, e.g.*, *Kraus v. Taylor*, 715 F.3d 589, 594 (6th Cir. 2013). Yet, he provides no basis for this panel to reconsider the earlier decision. This court refused to expand the COA because DiBiase failed to object to this aspect of the magistrate judge's recommendation, much less attempt to demonstrate excusable neglect and good cause for his

failure. *DiBiase*, No. 15-3666 at 3 ("[F]ailure to object to the magistrate's report and recommendation prior to the district court's adoption of such report constitutes a waiver of a right to appeal the district court's order." (quoting *United States v. Walters*, 638 F.2d 947, 949 (6th Cir. 1981))). In his reply brief, DiBiase observes that he was proceeding pro se in the district court. But that is not a sufficient basis to overlook his waiver, *see Peoples v. Hoover*, 377 F. App'x 461, 463 (6th Cir. 2010) (collecting cases enforcing this rule against pro se litigants), especially considering that petitioner was able to file a response to the Warden's objections arguing that the recommendation was "well-reasoned and applied the correct law/analysis." *See Javaherpour v. United States*, 315 F. App'x 505, 510 (6th Cir. 2009) (finding the petitioner's pro se status a "self-defeating" excuse because he filed objections to other aspects of the R&R).

III.

For these reasons, we affirm the judgment of the district court.